INSURANCE COMPANY OF NORTH AMERICA, Plaintiff-Respondent,

COLD SPRING EGG FARM, INC., Involuntary-Plaintiff-Respondent,

v.

CEASE ELECTRIC INC., d/b/a Zillmer Electric and Pekin Insurance Company, Defendants-Appellants.†

Court of Appeals

*No. 03–0689. Submitted on briefs October 8, 2003.—*
*Decided December 17, 2003.*

2004 WI App 15

(Also reported in 674 N.W.2d 886.)

287

On behalf of the defendants-appellants, the cause was submitted on the briefs of *Monte E. Weiss* and *J.P. Fernandes* of *Weiss Law Office, S.C.*, of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Timothy A. Bascom* and *Amy J. Uhlenbrauck* of *Bascom, Budish & Ceman, S.C.*, of Wauwatosa.

Before Anderson, P.J., Brown and Snyder, JJ.

¶ 1. BROWN, J. Cease Electric Inc., d/b/a Zillmer Electric and Pekin Insurance Company appeal from a judgment awarding Cold Spring Egg Farm, Inc., and

Insurance Company of North America damages for losses sustained due to the failure of a ventilation system Cease Electric installed in one of Cold Spring's hen barns and double taxable costs pursuant to WIS. STAT. § 807.01(3) (2001–02).[1] The appellants present two primary challenges to the judgment on appeal. First, the appellants argue that the trial court erred in refusing to impose sanctions against Cold Spring for its alleged spoliation of evidence. We conclude that Cold Spring's conduct does not qualify as spoliation because the record fails to demonstrate that Cold Spring knew, or should have known, at the time of the destruction of the evidence that litigation was a distinct possibility and that Cold Spring knew, or should have known, that the evidence would be relevant to such litigation. The appellants also submit that the economic loss doctrine precludes Cold Spring's recovery under any tort theory. We hold that the purpose of the transaction between Cold Spring and Cease Electric was for services and the economic loss doctrine has not been expanded to cover services. We affirm.

¶ 2. Cold Spring raises chickens to produce eggs at its egg farm.[2] In the summer of 1996, Cold Spring hired Cease Electric to upgrade the ventilation system in one of its barns. The ventilation systems are required to bring fresh, cooler air into the barns so that the birds have sufficient oxygen to live. Cold Spring purchased new fans for the system from Aerotech, Incorporated.

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

[2] We note that neither party properly cites to the record. An appellate court is improperly burdened where briefs fail to consistently and accurately cite to the record. *Meyer v. Fronimades*, 2 Wis. 2d 89, 93–94, 86 N.W.2d 25 (1957).

¶ 3. Prior to the installation of the new ventilation system, each ventilating fan had its own individual thermostat and operated independently of all other ventilating fans. The new ventilation system was designed so that a single controller would operate all of the fans in stages. As the temperature in the barn rose, the fan control would engage different fans to bring fresh air into the barn. As the temperature in the barn fell, the controller would turn off the fans accordingly. In addition to the primary fan control, the ventilation system was designed by the manufacturer to have a backup thermostat. In its instructions, the manufacturer recommended the use of a backup thermostat as a safety device in the event that the primary fan control failed to operate. The manufacturer also recommended wiring the backup thermostat to a power source that was separate from the power source for the primary fan control. Cold Spring retained Cease Electric to install the ventilation system's component parts, including the primary fan control and the backup thermostat. Brian Cease, who passed away in December 1997, installed the main fan control unit and the backup thermostat.

¶ 4. In November 1996, Cold Spring terminated its relationship with Cease Electric. Cold Spring had become concerned that Cease Electric was not completing the projects correctly or in a timely fashion.

¶ 5. On January 8, 1997, approximately three months after Cease Electric had completed wiring the ventilation system in the barn, the ventilation system failed. As a result of this failure, approximately 17,000 chickens died.

¶ 6. On the day of the loss, Scott Hartwig, the manager of the Cold Spring operation, called Carroll Electric,[3] a Cease Electric competitor, to the barn to respond to the situation. Al Dittmar, one of Carroll Electric's electricians, replaced the main fan control unit as well as the backup thermostat. Hartwig recalls Dittmar giving him the former primary fan control but not the old backup thermostat. He recalls that the replaced primary fan control had been placed in the office at Cold Spring but cannot remember what was done with the backup thermostat.

¶ 7. Within one week of the loss, Cold Spring hired Dittmar to conduct a diagnostic investigation to determine why the fans did not operate. Following an investigation, Dittmar reported to Cold Spring that he believed Cease Electric had improperly wired the ventilation system it sold to Cold Spring. Dittmar informed Hartwig that the main fan control unit was wired to the same power circuit as the backup thermostat. Thus, if the circuit breaker tripped, shutting off power to the circuit, then neither the main fan control unit nor the backup thermostat would have the power to turn on the fans. Dittmar then rewired the barn.

¶ 8. Pursuant to the insurance contract, INA paid Cold Spring $118,339.20 for the loss of income and $40,704.89 for the loss of chickens. Cold Spring itself sustained a loss of $39,761.02 due to its deductible. INA then commenced this subrogation action, naming Cold Spring as an involuntary plaintiff and Cease Electric and Pekin Insurance Company, Cease Electric's liability

[3] Carroll Electric is also referred to as Duck Creek Electric in the record. We will use Carroll Electric for purposes of this appeal.

insurer, as defendants. In its complaint, INA alleged the failure of the ventilation system was the result of Cease Electric's negligence.

¶ 9. At some point thereafter, at a mediation, the parties stipulated to the damages in this case and filed the stipulation with the court.[4] Apparently, the stipulated amount was for $198,805.11. Following this stipulation, Cold Spring and INA filed a joint statutory offer of settlement for $198,000.00. The offer allocated the amount as follows: $159,000.00 to INA and $39,000.00 to Cold Spring. Cease Electric presumably rejected the offer.

¶ 10. The appellants subsequently filed a motion to sanction Cold Spring for its alleged spoliation of evidence. The appellants contended that since Cold Spring had misplaced the backup thermostat, and Dittmar rewired the barn without documenting the miswiring, INA and Cold Spring should be precluded from introducing testimony concerning Dittmar's observations of the miswiring. The trial court, Judge Robert J. Kennedy presiding, concluded that Cold Spring's conduct, while regrettable, did not constitute spoliation of evidence. Shortly before the trial, Judge John R. Race, who replaced Judge Kennedy as a result of judicial rotation, again addressed the issue of spoliation. Judge Race also ruled that Cold Spring's conduct did not rise to the level of spoliation of evidence.

¶ 11. The appellants again raised the issue of spoliation of evidence at the conference on jury instruc-

---

[4] We cannot find evidence of the stipulation in the record. However, neither party disputes this fact, so we will proceed upon the assumption that the agreement took place. We observe that it is the appellant's responsibility to ensure that the record is sufficient to facilitate appellate review. *See Seltrecht v. Bremer*, 214 Wis. 2d 110, 125, 571 N.W.2d 686 (Ct. App. 1997).

tions, requesting that the court give an instruction on spoliation. The court denied their request on the grounds that they had failed to prove that the conduct of either INA or Cold Spring had risen to such a level as to warrant a spoliation instruction.

¶ 12. Following a two-day trial, the jury returned a verdict in favor of INA and Cold Spring. The trial court inserted the stipulated amount of damages into the jury verdict. The appellants moved for a judgment notwithstanding the verdict and reasserted their motions for a directed verdict at the close of evidence.[5] They argued that INA's and Cold Spring's claims were barred by the economic loss doctrine and that they had spoliated essential evidence and, as a consequence, their claims should be dismissed as a sanction. The trial court denied the motion and entered judgment for INA and Cold Spring totaling $204,065.29. This amount represented the amount of stipulated damages, in addition to $5260.18 in double costs awarded pursuant to WIS. STAT. § 807.01(3). This appeal followed.

¶ 13. We first address the appellants' contention that the trial court applied the incorrect legal standard in refusing to sanction Cold Spring for its alleged spoliation of evidence and it therefore erroneously exercised its discretion. The appellants submit that because Cold Spring intentionally engaged in conduct resulting in the destruction of evidence that ultimately would have been helpful to it in this lawsuit, the doctrine of spoliation applies and the trial court should have sanctioned Cold Spring by dismissing Cold

[5] Arguments on the defendants' motions for a directed verdict at the close of the plaintiffs' case and at the close of all evidence were not formally heard; however, the trial court noted on the record that the defendants' arguments were preserved for appeal.

Spring's claims, by excluding the evidence concerning the miswiring of the barn, or by issuing a jury instruction on spoliation.

■

¶ 14. A response to a request for the imposition of sanctions for the destruction of evidence or the negligent failure to preserve it is a matter subject to the sound discretion of the trial court. *See Sentry Ins. v. Royal Ins. Co. of Am.*, 196 Wis. 2d 907, 916, 539 N.W.2d 911 (Ct. App. 1995); *Milwaukee Constructors II v. Milwaukee Metro. Sewerage Dist.*, 177 Wis. 2d 523, 529, 502 N.W.2d 881 (Ct. App. 1993). The core issue is not whether this court, as an original matter, would have exercised its discretion in the same manner, but whether the trial court exercised its discretion free of error. We shall not find error if the trial court examined the relevant facts, applied a proper standard of law and, utilizing a demonstrated rational process, reached a conclusion that a reasonable judge could reach. *See Johnson v. Allis Chalmers Corp.*, 162 Wis. 2d 261, 273, 470 N.W.2d 859 (1991).

■

¶ 15. Not all destruction, alteration, or loss of evidence qualifies as spoliation. In *Milwaukee Constructors II*, 177 Wis. 2d at 532, we adopted the process for evaluating the details, significance and sanctions concerning allegations of destruction of evidence set forth in *Struthers Patent Corp. v. Nestle Co.*, 558 F. Supp. 747, 756 (D.N.J. 1981). *Struthers* instructs that in reviewing the conduct of the offending party, the trial court should consider not only whether the party responsible for the destruction of evidence knew, or should have known, at the time it destroyed the evidence that litigation was a distinct possibility, but also whether the offending party destroyed documents which it knew, or should have

known, would constitute evidence relevant to the pending or potential litigation. *See id.* at 756, 765 (holding that the destruction of documents which the party knew, or should have known, would be relevant to a pending or potential lawsuit is sanctionable).[6]

¶ 16. This two-part analysis makes perfect sense. The primary purpose behind the doctrine of spoliation is twofold: (1) to uphold the judicial system's truth-seeking function and (2) to deter parties from destroying evidence. Spoliation remedies advance truth by assuming that the destroyed evidence would have hurt the party responsible for the destruction of evidence and act as a deterrent by eliminating the benefits of destroying evidence. The court in *Pomeroy v. Benton*, 77 Mo. 64, *11 (1882), perhaps stated it best: "[t]he law, in hatred of the spoiler, baffles the destroyer, and thwarts his iniquitous purpose . . . by the very means he [or she] had so confidently employed to perpetrate the wrong." Common sense dictates that the purposes of the doctrine are served only if the offending party has

---

[6] We note that this conclusion is consistent with the established precedent of other jurisdictions. *See, e.g., Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991) (refusing to allow the trier of fact to draw an adverse inference from the destruction of evidence where the offending party did not destroy the evidence in response to litigation and the party was not on notice that the evidence had potential relevance to litigation); *Nat'l Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 556–57 (N.D. Cal. 1987) (defendant knew or should have known that the destroyed materials were relevant and discoverable); *Wm. T. Thompson Co. v. Gen. Nutrition Corp.*, 593 F. Supp. 1443, 1455 (C.D. Cal. 1984) (a party is under a duty to preserve what it knows, or reasonably should know, is relevant in the action).

notice that the evidence is or is likely to be relevant to pending or foreseeable litigation and proceeds to destroy the evidence anyway.

¶ 17. Here, although the trial court did not expressly apply the *Struthers* analytical framework, the court clearly understood its role in assessing Cold Spring's conduct. In determining that Cold Spring's actions did not constitute spoliation, both Judge Kenney and Judge Race concluded that when Cold Spring authorized Dittmar—the Carroll Electric electrician called to the site on the day of the loss—to rewire the barn, its only concern was to save the remaining birds by making certain that the ventilation system did not fail again and that the thermostat, which Dittmar gave to Hartwig, disappeared long before anyone was even thinking of a lawsuit. The trial court further observed that it was not until a week later that Cold Spring conducted an investigation into why the system failed and it was only then that it discovered that Cease Electric had allegedly miswired the backup thermostat to the same power source as the primary fan control. The testimony of Hartwig, the manager of the Cold Spring operations, and Dittmar concerning the facts surrounding the loss of evidence supports these conclusions. There simply was no reason for Cold Spring, at the time the evidence of the miswiring was destroyed, to have foreseen that litigation concerning the loss was a distinct possibility let alone that the evidence would be relevant to such litigation. Given these circumstances, we conclude that the trial court properly exercised its discretion in concluding that Cold Spring's conduct did not constitute spoliation of evidence and in refusing to impose sanctions.

¶ 18. We now turn to the second argument the appellants raise on appeal—that the economic loss doctrine bars Cold Spring's tort claims. The appellants first reason that Cold Spring was the purchaser of a product, and because its losses were the result of the failure of the product to function properly, the case falls squarely within the purview of the economic loss doctrine. In the alternative, the appellants contend that even if the transaction at issue was purely for services, the economic loss doctrine applies not only to economic loss due to defective products, but also to claims of recovery for economic losses due to the negligent provision of services. In contrast, the respondents counter that Cold Spring was the purchaser of Cease Electric's services and the economic loss doctrine in Wisconsin applies only to transactions involving products, not transactions involving services. Cold Spring maintains that the damages arose out of Cease Electric's negligent workmanship, specifically, failing to wire the backup thermostat to an independent power source.

¶ 19. The economic loss doctrine is a judicially created doctrine that precludes recovery under the tort theories of negligence or strict products liability for damages that are solely "economic" in nature. *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis. 2d 395, 400, 573 N.W.2d 842 (1998). The doctrine limits the parties involved in commercial transactions to pursue only their contractual remedies when asserting such damages. The application of the economic loss doctrine to a set of facts is a question of law which we review de novo. *State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.*, 225 Wis. 2d 305, 314, 592 N.W.2d 201 (1999).

¶ 20. Before we launch into a discussion of whether the economic loss doctrine applies to service

contracts, we must first determine whether the transaction involved was one for goods or one for services. The appellants argue that Cold Spring hired it to provide a new ventilation system for the barn and characterizes Cold Spring's claims as "disappointed expectations in the product's performance." The appellants mischaracterize Cease Electric's role and Cold Spring's theory of liability. Other than some wiring, we can find no evidence in the record demonstrating that Cease Electric sold any of the ventilation system's component parts to Cold Spring. The record clearly demonstrates that Cease Electric was hired to take component parts purchased from a third party and wire them into a ventilation system. Further, the respondents are not alleging that the primary fan control unit, the backup thermostat, any component parts, or any of the wires connecting the units to the power sources were defective or failed to perform as expected. Rather, they are alleging that Cease Electric's employees improperly wired the backup thermostat and failed to perform tests that would have revealed their errors. In short, Cold Spring hired Cease Electric to provide a service—the installation of the ventilation system—and claimed not that the product itself was defective, but rather, that Cease Electric negligently installed the otherwise properly functioning component parts and thus breached its professional obligation of due care.

■

¶ 21. Our supreme court has not yet addressed the issue of whether the economic loss doctrine covers claims of negligent provision of services.[7] In *Daanen,*

---

[7] We certified the issue to the supreme court in *Barr v. Premier Production Co.*, 2002 WL 31749954, at *1 (WI App Dec. 10, 2002) (No. 02–0688). However, the case was voluntarily

recognizing the distinction between cases arising out of the negligent provision of services and cases involving defective products, the court expressly reserved the issue of "whether the [economic loss] doctrine applies with equal force to damages resulting from the provision of services." *Daanen*, 216 Wis. 2d at 417 (footnote omitted). The court further cautioned that its past allusions to cases from other jurisdictions, which involved economic losses arising out of the provision of services, were not endorsements of an extension of the doctrine. *Id.* at 417 n.9. Currently, "economic loss" for the purposes of the doctrine is defined as "damage to a product itself or monetary loss caused by the defective product, which does not cause personal injury or damage to other property." *Id.* at 402. We are not aware of any subsequent case interpreting that definition as encompassing the provision of services.

¶ 22. The appellants contend that *Digicorp, Inc. v. Ameritech Corp.*, 2003 WI 54, 262 Wis. 2d 32, 662 N.W.2d 652, stands for the proposition that the economic loss doctrine applies to service contracts. *Digicorp* cannot be read so broadly. There, the court expressly framed its holding in narrow terms, recognizing a fraud in the inducement exception to the economic loss doctrine only where the claim of fraudulent inducement is extraneous, rather than interwoven with the contract. *Id.*, ¶ 3. Although *Digicorp* did arguably involve a service contract, the court did not address whether that fact was even relevant to its decision. There simply was no discussion of whether the eco-

dismissed and the appeal vacated before the supreme court had the opportunity to address the matter.
*See* ONLINE COURT RECORDS,
http://www.courts.state.wi.us/global/court_records.html
(provides status of cases before the supreme court).

nomic loss doctrine applies to claims arising out of the negligent provision of services.

¶ 23. Our supreme court, however, has allowed purely economic damages stemming from negligence claims involving parties who predominantly provide services, such as accountants and architects. *See Citizens State Bank v. Timm, Schmidt & Co.*, 113 Wis. 2d 376, 362, 335 N.W.2d 361 (1983); *A.E. Inv. Corp. v. Link Builders, Inc.*, 62 Wis. 2d 479, 486–87, 214 N.W.2d 764 (1974). Thus, for us to decide that the economic loss doctrine applies when the underlying contract is one for services rather than goods would be an expansion of the economic loss doctrine. We are primarily an error-correcting court, not a law-declaring court. *See Cook v. Cook*, 208 Wis. 2d 166, 188–89, 560 N.W.2d 246 (1977). The Wisconsin Supreme Court is the appropriate body to make that determination. Accordingly, we hold that the economic loss doctrine does not bar Cold Spring's claims for negligent provision of services.

¶ 24. Finally, the appellants contend that the trial court did not have the authority to exact the penalty provisions of Wis. Stat. § 807.01(3) and award Cold Spring double taxable costs. Section 807.01(3) provides that "the plaintiff may serve upon the defendant a written offer of settlement" and if the defendant rejects the offer and "the plaintiff recovers a more favorable judgment, the plaintiff shall recover double the amount of the taxable costs." The appellants claim that because the offer of settlement was made on behalf of two separate plaintiffs, it ran afoul of § 807.01(3). We can find no evidence in the record establishing that the appellants raised the issue before the trial court; the appellants direct us to none. In fact, notations on the Bill of Costs submitted by the respondents reveal just

the opposite. The Bill of Costs shows that the appellants objected to the referee's fee and the judgment filing fee, but no other costs. Issues not raised or addressed in the trial court will not be considered for the first time on appeal. *Wirth v. Ehly*, 93 Wis. 2d 433, 443, 287 N.W.2d 140 (1980), *superseded on other grounds by* WIS. STAT. § 895.52. We, therefore, deem the issue waived and decline to address it further.[8]

*By the Court.*—Judgment affirmed.

---

[8] The appellants also pick apart the costs the trial court awarded. We choose not to address these arguments because, even if error were found, it would only be de minimus. *See Preiss v. Preiss*, 2000 WI App 185, ¶ 23, 238 Wis. 2d 368, 617 N.W.2d 514.