INSURANCE COMPANY OF NORTH AMERICA, Plaintiff-Respondent,

COLD SPRING EGG FARM, INC., Involuntary-Plaintiff-Respondent,

v.

CEASE ELECTRIC INC., d/b/a Zillmer Electric and Pekin Insurance Company, Defendants-Appellants-Petitioners.

Supreme Court

*No. 03–0689. Oral argument September 10, 2004.—Decided November 9, 2004.*

2004 WI 139

(Also reported in 688 N.W.2d 462.)

362

For the defendants-appellants-petitioners there were briefs by *Monte E. Weiss* and *Weiss Law Office, S.C.,* Milwaukee; and *J.P. Fernandes* and *Hale & Wagner, S.C.,* Milwaukee, and oral argument by *Monte E. Weiss.*

For the plaintiff-respondent and involuntary plaintiff-respondent there was a brief by *Timothy A. Bascom, Richard E. Ceman, Jr., Amy J. Wilkinson* and *Bascom, Budish & Ceman, S.C.,* Wauwatosa, and oral argument by *Timothy A. Bascom.*

An amicus curiae brief was filed by *E. Campion Kersten* and *Kersten & McKinnon, S.C.*, Milwaukee; and *William C. Gleisner, III*, and *Law Offices of William Gleisner*, Milwaukee, on behalf of the Wisconsin Academy of Trial Lawyers.

An amicus curiae brief was filed by *Thomas P. Godar, John D. Finerty, Jr.*, and *Michael Best & Friedrich, LLP*, Madison; and *Michele Odorizzi* and *Mayer, Brown, Rowe & Maw, LLP*, Chicago, on behalf of Associated General Contractors of America, AGC of Wisconsin, Inc., and Associated General Contractors of Greater Milwaukee, and oral argument by *Michele Odorizzi.*

¶ 1. ANN WALSH BRADLEY, J. The petitioners, Cease Electric Inc., d/b/a Zillmer Electric and Pekin Insurance Company seek review of a court of appeals' decision affirming a circuit court judgment awarding Cold Spring Egg Farm, Inc., and its insurance carrier, Insurance Company of North America, damages for losses sustained due to the failure of a barn ventilation system.[1] Cease Electric, a contract electrician, asserts that it was retained to manufacture a product, namely the ventilation system. Accordingly, it contends that the economic loss doctrine precludes Cold Spring's recovery under tort.

¶ 2. We agree with Cold Spring that its contract with Cease Electric was one for services and not for a product. Because we determine that the economic loss doctrine does not apply to contracts for services, we conclude that Cold Spring is entitled to its recovery

---

[1] *Insurance Co. of North America v. Cease Electric, Inc.*, 2004 WI App 15, 269 Wis. 2d 286, 674 N.W.2d 886 (affirming a decision of the circuit court for Walworth County, John R. Race, Judge).

under tort for the negligent performance of services. We therefore affirm the decision of the court of appeals.[2]

I

¶ 3. Cold Spring raises chickens to produce eggs. It had a long-standing business relationship with Cease Electric. In the summer of 1996, Cold Spring entered into an oral contract with Cease Electric to upgrade the ventilation system in one of its barns. Ventilation systems are required to bring fresh, cool air into the barns so that the chickens have sufficient oxygen to live.

¶ 4. Prior to installation of the new system, Cold Spring had manual ventilation systems in its barns. Under the manual system, each individual fan had its own thermostat control independent of the other fans. If one individual fan failed, the remaining fans would continue to operate.

¶ 5. The new system was designed so that a single controller would operate all fans in stages. As the temperature in the barn rose, the fan control would engage different fans to bring fresh air into the barn. Conversely, when the temperature in the barn fell, the controller would turn off fans accordingly.

¶ 6. The "brains" of the new ventilation system was the main fan control unit: the ST-4026. Cold Spring purchased this component from Aerotech, Inc.

---

[2] Because we determine that Cease Electric's contract with Cold Spring was one for services, we do not address the proper test for distinguishing mixed contracts that involve both products and services. Similarly, because we conclude that the economic loss doctrine does not apply to contracts for services, we do not reach the issue of whether Cold Spring's chickens constituted "other property."

Aerotech designed the system to have a backup thermostat as a safety device in the event the primary fan control failed. It recommended wiring the backup thermostat separately from the power source for the primary fan control.

¶ 7.　Included with the ST-4026 was a one-page wiring schematic. Based on this diagram, Cold Spring asked Cease Electric to wire the ventilation system's component parts, including the primary fan control and the backup thermostat. Upon completion of the job, Cold Spring terminated its relationship with Cease Electric because it believed that Cease had not completed the project correctly or in a timely fashion.

¶ 8.　On January 8, 1997, the ventilation system in Cold Spring's barn failed, resulting in the loss of nearly 18,000 chickens. Within a week of the loss, Cold Spring hired Al Dittmar, an electrician with Carroll Electric, to investigate why the fans malfunctioned.

¶ 9.　Dittmar concluded that Cease Electric had improperly wired the main fan control unit to the same power circuit as the backup thermostat. He also determined that Cease Electric's employees had failed to test the new system, which would have revealed that the backup thermostat was not functioning.

¶ 10.　Pursuant to its insurance contract, Insurance Company of North America (INA) paid Cold Spring $118,339.20 for the loss of income and $40,704.89 for the loss of chickens. Cold Spring, meanwhile, sustained a loss of $39,761.02 due to its policy deductible. Both INA and Cold Spring commenced this action in June 1999, alleging that the failure of the ventilation system was the result of the negligence of Cease Electric in its performance of services.

¶ 11.　At the conclusion of a two-day trial, a jury found that the employees of Cease Electric were negli-

gent and that their negligence had caused the plaintiffs' loss. The circuit court inserted the stipulated amount of damages into the verdict. It then entered judgment in the total amount of $204,065.29, representing the amount of stipulated damages plus double costs awarded pursuant to Wis. Stat. § 807.01(3) (2001–02).[3] Cease Electric appealed.

¶ 12. On appeal, Cease Electric maintained that the plaintiffs' negligence action was precluded by the economic loss doctrine.[4] It argued that it had provided a product to Cold Spring, the ventilation system. According to Cease Electric, as the plaintiffs' case was one of disappointed expectations resulting in only economic losses to the product, the economic loss doctrine barred recovery in a tort action.

¶ 13. The court of appeals affirmed the circuit court. It concluded that the economic loss doctrine did not bar Cold Spring's recovery under tort. *Insurance Co. of North America v. Cease Electric Inc.*, 2004 WI App 15, ¶ 1, 269 Wis. 2d 286, 674 N.W.2d 886. Specifically, the court of appeals determined that Cease Electric had provided only services to Cold Spring and that, under Wisconsin law, the economic loss doctrine did not extend to service contracts. *Id.* Cease Electric and its insurer, Pekin Insurance Company, petitioned this court for review.

---

[3] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

[4] Additionally, Cease Electric asserted that the circuit court erred in (1) refusing to impose sanctions against Cold Spring for its alleged spoliation of evidence and (2) exacting the penalty provisions of Wis. Stat. § 807.01(3). The court of appeals rejected both arguments. *Insurance Co. of North America,* 269 Wis. 2d 286, ¶¶ 1, 24. Because we did not grant review of these issues, we do not address them here.

## II

¶ 14. This case provides us with an opportunity to further define the parameters of the economic loss doctrine in Wisconsin. Before doing so, however, we must first determine whether the transaction at issue was one for goods or services. Interpreting the nature of a contract presents a question of law subject to independent appellate review. *See Micro-Managers, Inc. v. Gregory,* 147 Wis. 2d 500, 507, 434 N.W.2d 97 (Ct. App. 1988).

¶ 15. The economic loss doctrine is a judicially created doctrine that seeks to preserve the distinction between contract and tort. *Daanen & Janssen, Inc. v. Cedarapids, Inc.,* 216 Wis. 2d 395, 403–04, 573 N.W.2d 842 (1998). From its inception, the doctrine has been based on the understanding that contract law, and particularly the law of warranty, is better suited than tort law for dealing with purely economic loss in the commercial arena. *Id.* Its application to a set of facts also presents a question of law subject to independent appellate review. *See Sunnyslope Grading, Inc. v. Miller, Bradford & Risberg, Inc.,* 148 Wis. 2d 910, 915, 437 N.W.2d 213 (1989).

## III

¶ 16. Our discussion begins with an examination of the nature of the contract at issue. Cease Electric contends that the court of appeals erred in characterizing its contract with Cold Spring as one for services. It asserts that it was hired to manufacture a unique ventilation system for Cold Spring's barn. According to

369

Cease Electric, it fashioned this system by providing additional component parts that Cold Spring did not have.[5]

¶ 17. The circuit court rejected Cease Electric's claim that it provided a product to Cold Spring. Similarly, the court of appeals determined that Cease Electric had mischaracterized its role in the agreement. *Insurance Co. of North America,* 269 Wis. 2d 286, ¶ 20. It concluded that Cold Spring had hired Cease Electric to provide the service of installing the new ventilation system. *Id.*

¶ 18. Like the court of appeals, we determine that the contract at issue was for services, and not for a product. Here, it was Aerotech's ST-4026 that created the ventilation system in the barn, not Cease Electric. All Cease was required to do was to follow the one-page wiring schematic to ensure that the controller was properly wired to ventilation fans and a power source. It failed to do so, and Cold Spring brought suit, alleging negligent performance of services.

¶ 19. A review of the record supports our conclusion. To begin, Cease Electric did not charge Cold Spring a one-time fee for the price of a "system." Rather, the electricians who did the work for Cease Electric kept time sheets and billed their time out on an hourly basis. Evidence of billing is a relevant consideration when determining the nature of a contract. *Micro-Managers,* 147 Wis. 2d at 508.

¶ 20. Furthermore, the testimony of Robert Cease, a principal of Cease Electric, belies Cease

---

[5] It is unclear from the record which party furnished the backup thermostat in this case.

Electric's assertion that it "manufactured" Cold Spring's ventilation system. After discussing the manual system in place before the installation of the Aerotech system, Cease made the following observation about the new fan controller: "The unit itself is sophisticated, but the wiring of it is very simple. You bring power in, you take power out to a fan or a stage of fans. So it's basically inputs and outputs."

¶ 21. Finally, although Cease Electric claims to have furnished additional component parts for Cold Spring's system, there is no evidence in the record to support this contention. As noted above, Cold Spring had purchased the ST-4026 from Aerotech. The only clear evidence of any "product" provided by Cease Electric is contained in Exhibit 3, which references merely conduit and wiring. Accordingly, we are satisfied that the contract at issue was for services and not for a product.

## IV

¶ 22. Having determined that the contract at issue was one for services, we turn next to the applicability of the economic loss doctrine here. Recently, this court described the economic loss doctrine as holding that a commercial purchaser of a product cannot recover solely economic losses from the manufacturer under negligence or strict liability theories, particularly where the warranty given by the manufacturer specifically precludes the recovery of such damages. *Van Lare v. Vogt,* 2004 WI 110, ¶ 18, 274 Wis. 2d 631, 683 N.W.2d 46 (citing *Sunnyslope,* 148 Wis. 2d at 921).

██

¶ 23. "Economic loss" for purposes of the doctrine is defined as "the loss in a product's value which occurs because the product is 'inferior in quality and does not

work for the general purposes for which it was manu-factured and sold.' " *Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis. 2d 235, 246, 595 N.W.2d 445 (1999) (quoting *Northridge Co. v. W.R. Grace & Co.*, 162 Wis. 2d 918, 925–26, 471 N.W.2d 179 (1991)). It includes both direct economic loss and consequential loss. *Daanen*, 216 Wis. 2d at 401.

¶ 24. The significance of the economic loss doc-trine is that it "requires transacting parties in Wisconsin to pursue only their contractual remedies when asserting an economic loss claim, in order to preserve the distinction between contract and tort." *Digicorp, Inc. v. Ameritech Corp.*, 2003 WI 54, ¶ 34, 262 Wis. 2d 32, 662 N.W.2d 652. In general, tort offers a broader array of damages than contract. The economic loss doctrine precludes parties under certain circumstances from eschewing the more limited contract remedies and seeking tort remedies.

¶ 25. There is a split among the jurisdictions as to whether the economic loss doctrine applies to contracts for services. As one treatise noted, "[t]he judiciary remains hopelessly divided on whether the doctrine should be extended to services . . . ." Philip L. Brunner and Patrick J. O'Connor, Jr., *Construction Law* § 19:10, at n. 14 (May 2004). This court has not yet addressed whether the doctrine covers such claims. Indeed, in *Daanen*, 216 Wis. 2d at 417, we expressly reserved the issue of "whether the doctrine applies with equal force to damages resulting from the provision of services."[6]

[6] In accordance with our decision, we withdraw the language in *Vogel v. Russo*, 2000 WI 85, ¶ 15, 236 Wis. 2d 504, 613 N.W.2d 177, suggesting that the economic loss doctrine pre-

¶ 26. The genesis of the economic loss doctrine lies in products liability cases. The seminal case on the economic loss doctrine is *Seely v. White Motor Co.*, 403 P.2d 145 (Cal. 1965). There, the California Supreme Court held that a plaintiff could not recover in a tort action for a defective truck that did not injure person or property, but only needed repairs after crashing due to defective brakes. *Id.* at 150–51. It reasoned that the losses suffered by the plaintiff were solely economic and due to the failure of the product to live up to the buyer's expectations. *Id.* at 151.

¶ 27. Wisconsin first recognized the economic loss doctrine in *Sunnyslope,* 148 Wis. 2d at 910, another products liability case. There, the plaintiff, a commercial contractor, purchased a backhoe directly from the defendant manufacturer. When the backhoe failed to properly perform, the plaintiff brought a tort action against the manufacturer for damages including the cost of replacement parts, labor charges, and lost profits. *Id.* at 914–15. This court denied the plaintiff relief, concluding that a commercial purchaser of a product cannot recover solely economic losses from the manufacturer under negligence or strict liability theories. *Id.* at 921.

¶ 28. The application of the economic loss doctrine in the abovementioned cases is not surprising given the protections afforded by the Uniform Commercial Code (U.C.C.). Adopted by the legislature in 1963, the U.C.C. sets forth the rights and remedies that govern a transaction between two commercial parties of relatively equal bargaining power. *Id.* at 916. It provides a " 'comprehensive system for compensating consumers

cludes recovery in tort of purely economic losses for the failure of a service to live up to contractual expectations.

373

for economic loss arising from the purchase of defective products.' " *State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.*, 225 Wis. 2d 305, 342, 592 N.W.2d 201 (1999) (quoting *Alloway v. General Marine Ind.*, 695 A.2d 264, 268 (N.J. 1997)).

¶ 29. Protection against damages caused by a defective product injuring itself is the purpose of express and implied warranties provided for in the U.C.C. *State Farm*, 225 Wis. 2d at 342. When a product fails to operate as warranted or expected, the proper avenue for relief is a breach of warranty claim. *Id.* Alternatively, customers can reject the product or revoke their acceptance and sue for breach of contract. *Id.*

¶ 30. Under the provisions of the U.C.C., purchasers of defective products are able to recover costs and lost profits, thereby placing them in the same position as if the product had functioned properly. *Id.* at 343. " 'The expectation damages available in warranty for purely economic loss give a plaintiff the full benefit of its bargain by compensating for forgone business opportunities.' " *Id.* (quoting *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 873 (1986)).

¶ 31. Additionally, the U.C.C. provides protections for manufacturers. Through the terms of a contract, a manufacturer can restrict its liability by disclaiming warranties or limiting remedies. *Id.* In return, the purchaser is likely to pay a lower price. *Id.* " 'The limitation in a contract action comes from the agreement of the parties and the requirement that consequential damages, such as lost profits, be a foreseeable result of the breach.' " *Id.* (quoting *East River*, 476 U.S. at 874).

¶ 32. It is the existence of these rights and remedies that serves as one of the critical rationales underlying the economic loss doctrine. After all, if a commercial purchaser were allowed to sue in tort to recover solely economic loss, the U.C.C. provisions designed to govern such disputes could be circumvented entirely. In that event, the U.C.C. would be rendered meaningless and "contract law would drown in a sea of tort." *East River,* 476 U.S. at 866.

¶ 33. Our case law recognizes this underlying rationale. In *Sunnyslope,* this court observed that, "the legislative protections granted by the Uniform Commercial Code are not to be buttressed by tort principles and recovery." 148 Wis. 2d at 916. Similarly, just last term, we warned of tort law duplicating contract remedies and adding unnecessary confusion into the law. We stated:

> Where there are well-developed contractual remedies, such as the remedies that the Uniform Commercial Code (in force in all U.S. states) provides for breach of the quality, fitness, or specifications of goods, there is no need to provide tort remedies . . . . The tort remedies would duplicate the contract remedies, adding unnecessary complexity to the law.

*Tietsworth v. Harley-Davidson, Inc.,* 2004 WI 32, ¶ 30, 270 Wis. 2d 146, 677 N.W.2d 233 (quoting *All-Tech Telecom, Inc. v. Amway Corp.,* 174 F.3d 862, 865 (7th Cir. 1999)). This reasoning is particularly significant in the present case.

¶ 34. Here, Cease Electric asks this court to extend the economic loss doctrine to contracts for services. It maintains that allowing Cold Spring to escape the confines of its agreement would permit a classic "end run," eviscerating the doctrine altogether. Cease Electric asserts that when a commercial party suffers a

375

failure in the performance of a contract and the loss sustained is solely economic, the doctrine should apply.

¶ 35. The major problem with Cease Electric's argument is that it assumes that contract law is better suited than tort law for dealing with purely economic loss in the context of service agreements. It is not. Unlike contracts for products or goods, which enjoy the benefit of well-developed law under the U.C.C., no such benefit exists for contracts for services. This is because the U.C.C. does not apply to service contracts. Wis. Stat. § 402.102. *Van Sistine v. Tollard,* 95 Wis. 2d 678, 684, 291 N.W.2d 636 (1980). As a result, the built-in warranty provisions that the U.C.C. may provide in a contract for the sale of products or goods would not apply to a contract for services.

¶ 36. Given the inapplicability of the U.C.C. to service contracts, we decline to extend the economic loss doctrine in this case. We note that we are not alone in this regard. *See, e.g., Cargill, Inc. v. Boag Cold Storage Warehouse,* 71 F.3d 545, 550 (6th Cir. 1995) (citing the U.C.C. and stating that the economic loss doctrine "is associated with 'transactions in goods,' and not with transactions in services"); *McCarthy Well Co., Inc. v. St. Peter Creamery, Inc.,* 410 N.W.2d 312, 315 (Minn. 1987) (explaining that the rationale behind the economic loss rule is that "a recognition of tort actions in cases under the U.C.C. would upset the remedies contained in the U.C.C.; when the rationale is not applicable, i.e., when the U.C.C. does not apply, there is no reason for the [economic loss] rule to apply").

¶ 37. The inapplicability of the U.C.C. and its warranties is particularly troubling in light of the facts of this case. Like many agreements between purchasers and providers of services, the agreement between Cold Spring and Cease Electric was oral rather than written.

376

Because of the informal circumstances surrounding most oral contracts for services, the policy provisions underpinning the application of the economic loss doctrine do not readily apply.

¶ 38. In *Daanen* this court identified three policies as a basis for application of the economic loss doctrine to tort actions: (1) to maintain the fundamental distinction between tort and contract law; (2) to protect commercial parties' freedom to allocate economic risk by contract; and (3) to encourage the party best situated to assess the risk of economic loss to assume, allocate, or insure against that risk. 216 Wis. 2d at 403. We address each in turn.

¶ 39. Even though the distinctions between tort and contract law at times may seem blurred, they differ in the interests that each protects. Tort principles protect not only the individuals harmed but also demonstrate a public policy to protect society against the unreasonable risk of harm from accidental and unexpected injury. Christopher J. Faricelli, *Wading Into The "Morass": An Inquiry Into the Application of New Jersey's Economic Loss Rule To Fraud Claims,* 35 Rutgers L.J. 717, 723 (Winter 2004).

¶ 40. On the other hand, an operating principle behind contract law is that bargaining parties to a contract will allocate the risks of non-performance. *Id.* at 722. The disappointed party to the contract is protected against non-performance by the benefit of the bargain. *Id.* at 722–23. Thus, when a contract is broken, the breaching party is liable for restoring the non-breaching party to the position he or she would have been in, regardless of negligence or intent. Michelle Kristin Hart, *Tort or Contract?: New Jersey's Simulta-*

*neous Expansion and Dilution of Contract Theory,* 26
Rutgers L.J. 495, 496 (1995).

¶ 41. As noted above, contract law is not better
suited than tort law for dealing with negligently pro-
vided services. Tort law provides an incentive generally
to guard against negligent conduct in the provision of
services. If tort law is avoided, the ability to deter
certain activity is impaired because contract remedies
and warranties may be easily disclaimed. Tort prin-
ciples address more than merely a private interest
between two commercial companies; they also address
society's interest in minimizing harm by deterring
negligent conduct.

¶ 42. Admittedly, contract law also advances a
societal interest in seeing that bargained for promises
are performed. The fundamental premise in the appli-
cation of contract law is that the bargaining parties will
allocate the risks and remedies. As the facts demon-
strate in this case, however, this fundamental premise
simply is not at work with many service contracts.

¶ 43. Often the circumstances surrounding ser-
vice contracts are simple and informal (e.g., electri-
cians, plumbers, lawn care providers, etc.). In light of
the societal interests behind the application of tort
principles, and the inapplicability of the fundamental
premise supporting contract law, the policy of maintain-
ing the distinction between tort and contract law does
not warrant the invocation of the economic loss doc-
trine here.

¶ 44. Likewise, the second policy consideration of
protecting the parties' freedom to allocate economic risk
by contract is not implicated. Certainly, parties to
service contracts, oral or written, can by means of
contractual provisions allocate risk and limit remedies.
Yet given the informality of such agreements, few

378

parties actually address the allocation of risk or the limitation of remedies. They neither discuss it themselves nor hire attorneys to draft written agreements.

¶ 45. Once again the concept of the parties engaging in discussions of pre-negotiated liability in the event of breach seems to fly in the face of the reality of routine service contract relationships. Although the freedom to allocate economic risk by contract should not be impinged, applying the economic loss doctrine to limit recovery based on the premise that the parties have indeed exercised that freedom simply makes no sense.

¶ 46. Finally, we examine the third policy that the party in the best position to assess the risk of economic loss should be encouraged to assume, allocate, or insure against the risk. The requirement of pre-negotiated agreements seems to presuppose that each party to the service contract can negotiate the terms with an identical level of bargaining power. In many service contract relationships, the information disparities between the parties do not support such a presupposition.

¶ 47. Here, Cold Spring argues that a contractor has more knowledge than the buyer concerning the service that is provided. Cease Electric responds that Cold Spring is in the better position to assess what economic loss will occur to their business if the service fails. Who can better assess the risk of economic loss seems to fall to a case-by-case application. Thus, the third policy consideration, as a general rule, neither supports nor negates the application of the economic loss doctrine to service contracts.

¶ 48. On balance, we conclude that the policy considerations underlying the economic loss doctrine do not support its extension here. Instead, they buttress our decision not to extend the doctrine given the inapplicability of the U.C.C.

¶ 49. In reaching this result, we are mindful of the ramifications that would accompany a decision to extend the doctrine to such agreements. Wisconsin courts have previously held that claims for professional malpractice lie both in tort and contract. *See, e.g., Milwaukee County v. Schmidt, Garden & Erikson,* 43 Wis. 2d 445, 453, 168 N.W.2d 559 (1969) (architects); *Smith v. Long,* 178 Wis. 2d 797, 803, 505 N.W.2d 429 (Ct. App. 1993) (attorneys); *Milwaukee Partners v. Collins Engineers, Inc.,* 169 Wis. 2d 355, 363, 485 N.W.2d 274 (Ct. App. 1992) (engineers). Because actions against professionals often involve purely economic loss without personal injury or property damage, the economic loss doctrine could be used to effectively extinguish such causes of action in tort.

¶ 50. Inevitably, this court would find itself on a slippery slope of having to decide whether an exception should be made for some or all professional groups. For an illustration of this problem, we need look no further than what is occurring in Illinois, where the state supreme court has exempted some professions from the economic loss doctrine, *Congregation of the Passion v. Touche Ross & Co.,* 636 N.E.2d 503, 515 (Ill. 1994) (accountants), *Collins v. Reynard,* 607 N.E.2d 1185, 1187 (Ill. 1992) (attorneys), but not others, *Fireman's Fund Ins. Co. v. SEC Donohue, Inc.,* 679 N.E.2d 1197, 1201 (Ill. 1997) (engineers), *2314 Lincoln Park West Condominium Ass'n v. Mann, Gin, Ebel & Frazier Ltd.,* 555 N.E.2d 346, 353 (Ill. 1990) (architects).

¶ 51. This inconsistency in application has led one justice to criticize the decision-making process as creating an "exception of the month." *Congregation of the Passion,* 636 N.E.2d at 525 (Heiple, J., dissenting). That justice further lamented that such a case-by-case approach "[fails] to coherently differentiate between these

professional groups," and therefore "[places] trial judges and litigants in the unenviable position of guessing which additional professions will receive protection under [the state's] economic loss doctrine." *Fireman's Fund Ins.*, 697 N.E.2d at 1202 (Heiple, J., dissenting).

¶ 52. Today, we choose to avoid those ends by avoiding this beginning. Accordingly, we determine that the economic loss doctrine is inapplicable to claims for the negligent provision of services. This bright line rule will limit the uncertainty and increased litigation that would accompany any other decision.

## V

¶ 53. In sum, we agree with Cold Spring that its contract with Cease Electric was one for services and not for a product. Because we determine that the economic loss doctrine does not apply to contracts for services, we conclude that Cold Spring is entitled to its recovery under tort for the negligent performance of services. We therefore affirm the decision of the court of appeals.[7]

*By the Court.*—The decision of the court of appeals is affirmed.

[7] Prior to oral argument, Cold Spring and Insurance Company of North America filed a motion asking this court to reconsider its granting of the petition for review. That motion was held in abeyance pending the court's decision on the merits of this case. The court now denies Cold Spring's motion.