In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-3762

SCHREIBER FOODS, INC.,

*Plaintiff-Appellant*,

*v.*

LEI WANG,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 1:08-cv-00962-WCG—**William C. Griesbach**, *Judge*.

ARGUED JUNE 8, 2011—DECIDED JULY 5, 2011

Before POSNER, KANNE, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*. In a diversity suit that presents issues of Wisconsin common law, Schreiber Foods charges Lei Wang with fraud. The district court granted summary judgment in favor of the defendant on the ground that the suit was barred by Wisconsin's version of the economic-loss doctrine of tort law.

Lei Wang is an American citizen of Chinese descent who owns an automotive-parts supply business in Chi-

cago. A cousin of hers who lives in China, Cade Wang, runs a pair of trading companies, one of which is named Mature Sky. (Originally a defendant along with Lei Wang, Mature Sky was never served, and the district judge dismissed it from the case, without prejudice.) To simplify the opinion we'll pretend that the two trading companies are actually one, and call it Mature Sky.

Mature Sky did business with a large Chinese manufacturer of dairy products called Inner Mongolia Yili Industrial Group ("Yili"). Cade Wang asked his cousin to help him find a supplier in the United States of dairy product ingredients. Lei Wang went to China and met with executives of Yili to get a better idea of what Yili wanted. Returning to the United States she approached Schreiber, a leading supplier of dairy products and dairy product ingredients, and told Juliet Prescod, the Schreiber Global Sales Associate with whom she dealt, that although she really didn't know anything about the dairy business, Yili was interested in buying ingredients for dairy products in the United States through Mature Sky. She didn't claim to be an agent of Yili, however. Prescod asked Lei Wang to supply her with credit information about Yili. Lei Wang forwarded the request to her cousin, who faxed what appeared to be (and for all we know was) an authentic signed copy of Yili's credit statement.

Shortly afterward Mature Sky ordered a batch of a whey protein concentrate from Schreiber at an agreed price of $42,240. The transaction was a success, though because of delay in transferring money from China Lei

Wang paid Schreiber with a check issued by her automotive-parts company; she was reimbursed by Mature Sky.

A few months later Lei Wang negotiated with Prescod the sale by Schreiber to Mature Sky of 200 metric tons of "Demineralized Whey Powder 70%" (D70), an ingredient in infant formula. Schreiber set a price of $603,000. Lei Wang told Prescod that although the price was stiff, Yili was willing to pay it; the unmistakable implication—given the prior course of dealing—was that Mature Sky would be buying the D70 on behalf of Yili. Schreiber claims that this was a misrepresentation; that Yili was not committed to buying Schreiber's D70 from Mature Sky.

Although Schreiber had contracted to sell D70 to Mature Sky, it decided to substitute Reduced Minerals Whey Blend (RMW-2) without telling Yili, Mature Sky, or either Wang about the substitution. It claims that RMW-2 is materially identical to D70—yet a previous shipment by Schreiber of RMW-2, to another Chinese company, a deal also handled by Prescod, had failed to clear customs in China; the customs officials had declared that it didn't satisfy the Chinese hygienic standard for whey powder. Schreiber didn't reveal this contretemps to Yili or the others. It did send a sample of RMW-2 to Mature Sky (of course without revealing that it wasn't D70) before the sale of the 200 metric tons was consummated, and Mature Sky accepted it. But the sample had been hand-blended in a laboratory to make it look and taste just like D70, rather than being taken from an RMW-2 production line.

We are disappointed that a company of Schreiber's standing (it has $3 billion in annual revenues) would do what it did: substitute for the product specified in its contract with Mature Sky, without disclosure, an ingredient in infant formula that it knew had previously been refused entry into China on hygienic grounds. In any event the 200 metric tons were shipped, and apparently they made it through Chinese customs. But Yili refused to accept the product, on the ground that "the protein was lower, fat was higher, and . . . the flavor is different" from what it had expected. Schreiber was never paid, and refused to accept the return of the product, for which apparently there was no market because it was perishable and had deteriorated.

Schreiber's contract was with Mature Sky rather than with Yili, but Schreiber is not at present pursuing any remedies it might have against Mature Sky. Instead it claims that Lei Wang's representation to Prescod that Yili had agreed to buy the 200 metric tons from Mature Sky was fraudulent; and it notes that Cade Wang gave Lei Wang a 17.5 percent ownership interest in Mature Sky and thus a financial stake in Mature Sky's profits, though she claims to have been unaware of the gift.

Without attempting to resolve any factual disputes, the district judge ruled that even if Lei Wang did defraud Schreiber, its suit against her was barred by the economic-loss doctrine; whether this ruling was correct is the only issue we need address.

The aspect of the doctrine that is applicable to this case bars tort liability when the plaintiff has a contract

with the defendant and contract law provides an adequate remedy for the type of injury alleged. Courts prefer parties to govern their relations through privately negotiated contracts when that is feasible (that is, when transaction costs—the costs of making an effective contract—are low), provided there are no third-party effects, as there are for example when the performance of a contract causes pollution to third parties. Contracting parties know their business better than a court can and so can allocate risk and responsibility between them more intelligently than a court could do. "[T]ort law is a superfluous and inapt tool for resolving purely commercial disputes. We have a body of law designed for such disputes. It is called contract law . . . . [C]ommercial disputes ought to be resolved according to the principles of commercial law rather than according to tort principles designed for accidents that cause personal injury or property damage. A disputant should not be permitted to opt out of commercial law by refusing to avail himself of the opportunities which that law gives him." *Miller v. United States Steel Corp.*, 902 F.2d 573, 574-75 (7th Cir. 1990) (Wisconsin law); see *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 573 N.W.2d 842, 847-50 (Wis. 1998).

This branch of the economic-loss doctrine stems from *Seely v. White Motor Co.*, 403 P.2d 145, 150-51 (Cal. 1965). The plaintiff in that case had bought a truck that turned out to have defective brakes. The truck overturned but the plaintiff was not hurt; nor was there damage to any other property. He sued in both contract and tort to recover repair costs and lost profits. The court held that

he was limited to suing for breach of warranty. Imposing tort liability, which would be strict liability for a product defect, would have prevented the parties to the sale of a product from agreeing between themselves on the allocation of the risk of a purely commercial loss, and of the responsibility for trying to minimize it. "Had defendant not warranted the truck, but sold it 'as is,' it should not be liable for the failure of the truck to serve plaintiff's business needs." *Id.* at 150. "To allow [the plaintiff] to use tort law in effect to enforce an oral warranty would unsettle contracts by exposing sellers to the risk of being held liable by a jury on the basis of self-interested oral testimony and perhaps made to pay punitive as well as compensatory damages. This menace is averted by channeling disputes into warranty (contract) law, where oral warranties can be expressly disclaimed, or extinguished by operation of the parol evidence rule." *All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 866 (7th Cir. 1999) (Wisconsin law).

But suppose the seller of the truck, knowing it was defective, had told the plaintiff that it was in mint condition, and, thus reassured, the plaintiff had waived all warranties in exchange for a lower price. That would be a case in which a person had been induced to sign a contract (or agree to particular provisions in a contract) by fraud on the part of the other party. Many state courts don't apply the doctrine of economic loss in such a case but instead permit the defrauded party to sue in tort. Without such an exception "prospective parties to contracts will be able to obtain legal protection against fraud only by insisting that the other party to the

contract reduce all representations to writing, and so there will be additional contractual negotiations, contracts will be longer, and, in short, transaction costs will be higher. And the additional costs will be incurred in the making of every commercial contract, not just the tiny fraction that end up in litigation." *Id.* at 867; see also Steven C. Tourek, Thomas H. Boyd & Charles J. Schoenwetter, "Bucking the 'Trend': The Uniform Commercial Code, the Economic Loss Doctrine, and Common Law Causes of Action for Fraud and Misrepresentation," 84 *Iowa L. Rev.* 875, 891-95 (1999). True, the parties could include a clause warranting that they had made no intentional misrepresentations in the course of negotiating the contract. But the negotiation of such a warranty would be complicated and engender suspicion. The unavailability of punitive damages in contract cases would also be a problem; because fraud is concealed, punitive damages may be necessary for deterence. With a tort suit for fraud as an option in the background of the negotiations, parties can negotiate a limitation of liability for fraud if they want, as in *Extra Equipamentos e Exportação Ltda. v. Case Corp.*, 541 F.3d 719, 722-26 (7th Cir. 2008).

Several states, however, including Wisconsin, recognize only a very narrow fraud exception to the denial of recovery for economic loss. (Exceptions that vary from state to state are a common feature of the economic-loss doctrine. See Anthony Niblett, Richard A. Posner & Andrei Shleifer, "The Evolution of a Legal Rule," 39 *J. Legal Stud.* 325, 334-36 (2010).) These states hold that the fraud must be "extraneous" to the contract, rather than "inter-

woven" with it, to be actionable as a tort. *Wickenhauser v. Lehtinen*, 734 N.W.2d 855, 868-69 (Wis. 2007); *Kaloti Enteprises, Inc. v. Kellogg Sales Co.*, 699 N.W.2d 205, 219-20 (Wis. 2005); *Digicorp, Inc. v. Ameritech Corp.*, 662 N.W.2d 652, 665-66 (Wis. 2003); John J. Laubmeier, Comment, "Demystifying Wisconsin's Economic Loss Doctrine," 2005 *Wis. L. Rev.* 225, 237-40; see also *Huron Tool & Engineering Co. v. Precision Consulting Services, Inc.*, 532 N.W.2d 541, 544-45 (Mich. App. 1995).

The extraneous versus interwoven formula is not pellucid, but the facts and analysis in the *Kaloti Enterprises* case help us to understand it. Kellogg sold cereal to a wholesaler, Kaloti, knowing that because Kaloti was a wholesaler it was buying the cereal in order to resell it to retailers. Kellogg did not tell Kaloti that it had decided to sell cereal directly to Kaloti's principal customers. As a result of that decision, those customers refused to buy from Kaloti, preferring to buy directly from Kellogg now that they could. The court held that Kellogg's implied representation to Kaloti that the latter could resell the cereal (at a remunerative price: doubtless at some price Kaloti could have unloaded the cereal on the customers, who were not, so far as appears, required to buy directly from Kellogg) was an "extraneous" fraud. The implied representation did not concern Kellogg's performance of the contract, as it would have done had it concerned the quality or character of the product, but rather "a matter whose risk was never contemplated to be a part of the contract"; it was "not a matter that was dealt with in the contract, nor would one expect it to be dealt with in the contract." *Kaloti Enteprises, Inc. v. Kellogg Sales Co., supra*, 699 N.W.2d at 220, 228.

The critical phrase is the last—"nor would one expect it to be dealt with in the contract." The rationale for the broader fraud exception that a number of other states have embraced is that fraud places the other party to the contract at an information disadvantage. Now it is true that parties to a contract often have unequal information going in, and ordinarily a party with superior information is entitled to exploit it in negotiations. (For a famous example, see *Laidlaw v. Organ*, 15 U.S. (2 Wheat.) 178 (1817).) Otherwise businessmen's incentives to obtain commercially valuable information, and by doing so speed the adjustment of prices to new conditions of supply and demand, would be impaired. *Emerald Investments Limited Partnership v. Allmerica Financial Life Ins. & Annuity Co.,* 516 F.3d 612, 616-17 (7th Cir. 2008). But that is different from obtaining an information advantage over the other party to the contract by fraud.

Yet as the Wisconsin courts recognize, not all frauds in a contractual setting have that effect, and the fraud alleged in this case is a good example of one that does not. The falseness of a false representation by Lei Wang that Yili wanted the 200 metric tons of (supposed) D70 would undoubtedly reduce the probability that Schreiber would ever collect the $603,000 sale price. But that probability was always well below 100 percent. The contract was with Mature Sky, an obscure middleman in a foreign country, and had been procured for the trader by the owner of a company in a business (auto parts) unrelated to that of Schreiber or Mature Sky. The trader was expecting to resell the product to another Chinese company, one with which Schreiber had no

contract; and as far as Schreiber knew, if that company (Yili) refused to buy the product from Mature Sky, the latter would be unable to sell it to anyone else, and if it became stuck with the product it might be unable or unwilling to pay Schreiber. And finally Schreiber did not ship the product that it had contracted to sell, and thus assumed the risk that the product it did ship would turn out not to be salable in China at all, which would justify Mature Sky in refusing to accept it; and if it refused, the product, being perishable, might be worthless and so a dead loss to Schreiber—as it turned out to be.

Schreiber acted recklessly in failing to take steps to protect itself against a range of risks of nonpayment, of which fraud by Lei Wang, one of the go-betweens, was only one. The risk of nonpayment was so salient a risk that one would expect it to have been dealt with in the contract. It's not as if contract law contains no resources for dealing with such a matter. Schreiber could have done many things to protect itself, such as requiring Mature Sky or Yili to obtain a letter of credit for Schreiber's benefit guaranteeing payment by Mature Sky; or obtaining a contractual guaranty from Yili; or at the very least warning Mature Sky that it was shipping RMW-2 rather than D70. Schreiber failed in negotiating the contract to take elementary precautions for an international shipment and now wants the judiciary to bail it out.

Schreiber's conduct thus came within the "interwoven" exception to Wisconsin's fraud exception to the doctrine of economic loss and more broadly within the theory

behind the doctrine, which as we said is to require private ordering of commercial relations where feasible and not harmful to third parties. Just as "where there are well-developed contractual remedies, such as the remedies that the Uniform Commercial Code (in force in all U.S. states) provides for breach of warranty of the quality, fitness, or specifications of goods, there is no need to provide tort remedies for misrepresentation," *All-Tech Telecom, Inc. v. Amway Corp.*, *supra*, 174 F.3d at 865, so when there are well-developed contractual means of protecting against risk of nonpayment there is likewise no need to provide tort remedies.

Schreiber invokes a second exception in Wisconsin law to the economic-loss doctrine, however, and that is the doctrine's nonapplicability to contracts for the sale of services rather than of goods. E.g., *Insurance Co. of North America v. Cease Electric Inc.*, 688 N.W.2d 462, 467-72 (2004). Most states do not apply the doctrine to providers of specified professional services, such as doctors, lawyers, and architects. See, e.g., *Bilt-Rite Contractors, Inc. v. Architectural Studio*, 866 A.2d 270, 284-85 (Pa. 2005) (architects); *Collins v. Reynard*, 607 N.E.2d 1185, 1186-87 (Ill. 1992) (lawyers); *Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.*, 463 S.E.2d 85, 88-89 (S.C. 1995) (engineers); *Chew v. Paul D. Meyer, M.D., P.A.*, 527 A.2d 828, 831-32 and n. 2 (Md. App. 1987) (doctors). There is often an extreme asymmetry of information between seller and buyer when the seller is the provider of a professional service. Many clients don't understand professional services and so cannot negotiate effectively for protection against providers' negligence.

That is why the law imposes fiduciary duties on such providers, duties that go beyond the duty of care imposed by a negligence standard and require the provider to treat his customer as well as he would want to be treated himself.

The Supreme Court of Wisconsin has decided to simplify the exception by extending it to all providers of services, not just professionals. *Insurance Co. of North America v. Cease Electric Inc.*, *supra*, 688 N.W.2d at 472; *Shister v. Patel*, 776 N.W.2d 632, 637 (Wis. App. 2009); Andrew Gray, Note, "Drowning in a Sea of Confusion: Applying the Economic Loss Doctrine to Component Parts, Service Contracts, and Fraud," 84 *Wash. U. L. Rev.* 1513, 1524-27 (2006). This opens the way for Schreiber's argument that Lei Wang is not protected by the doctrine because she was providing a service to Schreiber rather than buying goods from it.

The defendant in *Shister v. Patel* was a real estate broker; Lei Wang was a kind of broker. But the application of the doctrine to her would be perverse. Rather than being more knowledgeable about the subject matter of the contract than Schreiber, she was less knowledgeable. Anyway the Wisconsin courts have already tumbled to the fact that a literal interpretation of the exception would be untenable because every sale of goods involves the provision of service, if only by the employees or other agents who negotiate the contract, supervise performance, and so forth, and so the exception would swallow the rule (though often the employee or other agent, but especially an employee, would be

judgment proof and so not worth suing). The Supreme Court of Wisconsin has held therefore that the services exception applies only if the contract is *predominantly* one for services, *Linden v. Cascade Stone Co.*, 699 N.W.2d 189, 193-94 (Wis. 2005)—which the contract between Schreiber and Mature Sky was not. It was a contract for the sale of goods. The provision of services was limited to services normally involved in such sales, such as, in this case, finding a seller of a product desired by the agent's principal.

Imposing liability on Lei Wang would not correct an unjustifiable information asymmetry; it would plug no other loophole in contract law either, since, as we said earlier, Schreiber could easily have protected itself contractually against the risk of nonpayment that it seeks ex post to shift to Lei Wang by invoking tort law.

AFFIRMED.