**2024 WI App 33**

# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.:          2022AP723

PRE filed June 6, 2024

Complete Title of Case:

> **CAROL LORBIECKI,**
>
>> **PLAINTIFF-RESPONDENT-CROSS-APPELLANT,**
>
> **ESTATE OF GERALD E. LORBIECKI,**
>
>> **PLAINTIFF,**
>
>> **V.**
>
> **PABST BREWING COMPANY,**
>
>> **DEFENDANT-APPELLANT-CROSS-RESPONDENT,**
>
> **INGERSOLL RAND COMPANY, MOLSON COORS BREWING COMPANY,**
> **SEARS, ROEBUCK AND CO., GENERAL ELECTRIC COMPANY AND**
> **CLEAVER-BROOKS INC.,**
>
>> **DEFENDANTS.**

| | |
|---|---|
| Opinion Filed: | May 7, 2024 |
| Submitted on Briefs: | January 10, 2023 |
| Oral Argument: | January 10, 2024 |

| | |
|---|---|
| JUDGES: | White, C.J., Donald, P.J., and Geenen, J. |
| Concurred: | |
| Dissented: | |

Appellant
ATTORNEYS:      On behalf of the defendant-appellant-cross-respondent, the cause was submitted on the brief of *David J. Turek* of *Gass Turek LLC*, Milwaukee

Respondent
ATTORNEYS:      On behalf of the respondent and cross-appellant, the cause was submitted on the brief of *Lynn Laufenburg* and *Melissa J. Probst* of *Gingras, Thomsen & Wachs, LLP*, Milwaukee, and *Lisa W. Shirley (pro hac vice)* and *Jonathan Holder (pro hac vice)* of *Dean Omar Branham Shirley, LLP*, Dallas, TX, .

2024 WI App 33

# COURT OF APPEALS
## DECISION
## DATED AND FILED

## May 7, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP723**

Cir. Ct. No. 2018CV4971

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT I

CAROL LORBIECKI,

PLAINTIFF-RESPONDENT-CROSS-APPELLANT,

ESTATE OF GERALD E. LORBIECKI,

PLAINTIFF,

V.

PABST BREWING COMPANY,

DEFENDANT-APPELLANT-CROSS-RESPONDENT,

INGERSOLL RAND COMPANY, MOLSON COORS BREWING COMPANY, SEARS, ROEBUCK AND CO., GENERAL ELECTRIC COMPANY AND CLEAVER-BROOKS INC.,

DEFENDANTS.

APPEAL and CROSS-APPEAL from a judgment of the circuit court for Milwaukee County: CHRISTOPHER R. FOLEY, Judge. *Affirmed in part; reversed in part and cause remanded with directions.*

Before White, C.J., Donald, P.J., and Geenen, J.

¶1      WHITE, C.J. Pabst Brewing Company (Pabst) appeals from the judgment entered upon a jury's verdict finding it in violation of the safe place statute and liable for approximately $6.9 million in compensatory and punitive damages for the injury and death of Gerald Lorbiecki from mesothelioma resulting from asbestos exposure. Pabst argues multiple issues with the trial including sufficiency of the evidence, jury instructions, evidentiary admissions, allowing the jury to consider punitive damages, imputing a subcontractor's liability to Pabst, and denying judgment notwithstanding the verdict (JNOV) on grounds that the claim was not legally sufficient. We conclude that Pabst's arguments fail.

¶2      Carol Lorbiecki, individually and as the personal representative for the Estate of Gerald E. Lorbiecki (hereinafter, Lorbiecki), cross-appeals the judgment, arguing that the circuit court failed to properly apply the punitive damages statute, WIS. STAT. § 895.043 (2021-22),[1] in the calculation of the judgment. We conclude that the punitive damages statute requires doubling the total compensatory damages recovered by Lorbiecki, not doubling only Pabst's apportionment of the compensatory damages. Therefore, we grant Lorbiecki's cross-appeal in part, reverse the judgment in part and remand to the circuit court with directions to enter judgment for punitive damages consistent with this opinion.

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

## BACKGROUND

¶3      Gerald worked as a pipefitter from the mid 1970s until the early 2000s at multiple worksites in Wisconsin, including Pabst, where he was exposed to asbestos-containing materials at the worksites.  Gerald was diagnosed with mesothelioma in 2017 and died in January 2018, after initiating this action against multiple defendants for negligence and violations of the safe place statute relating to his asbestos exposure.[2]

¶4      The case proceeded to a jury trial in September and October 2021.  At trial, Lorbiecki presented Larry Schroeder, a steamfitter in the same union who worked with Gerald in a similar role at Pabst.[3]  Lorbiecki also presented two expert witnesses:  Dr. Arnold Brody, a cell biologist and experimental pathologist, and Dr. Edwin Holstein, a doctor specializing in preventative medicine and occupational medicine, with a concentration on asbestos.  The jury also heard from Carol, Gerald's wife, and Scott, his son.  Lorbiecki called John Kimes, the corporate representative for Pabst in its current ownership group, which was not the owner of Pabst at the time of Gerald's work there.  The jury also was shown a video deposition of Jack Wetzel, a delivery driver for Sprinkmann Sons who delivered insulation materials to Pabst.  Pabst then read in the depositions of Ralph Van Beck, a vice president at Sprinkmann, and another deposition of Wetzel.

---

[2] The circuit court granted partial summary judgment in Pabst's favor on Lorbiecki's negligence claim and that claim was dismissed in May 2020.

[3] We note that Schroeder identified Gerald as a fellow member of the Local 601 Steamfitters union.  While Gerald's profession is generally presented as a pipefitter, Schroeder described Gerald and himself as steamfitters.  We do not consider either man's job title as dispositive to this matter.

Pabst also called Dr. Kimberly Hoppe-Parr, a certified industrial hygienist, as an expert witness.

¶5    The jury found that Pabst's "negligence in violating the [s]afe [p]lace [s]tatute" was a "cause of [Gerald's] mesothelioma." The jury also found four other companies liable for Gerald's injury. Three of these companies were defendants that had been dismissed by stipulation.[4] The final company, Sprinkmann, was a subcontractor at Pabst and not a named defendant; the jury was asked whether Sprinkmann was negligent with respect to Gerald's health and safety. The jury apportioned liability as follows: Pabst at 22%, Sprinkmann at 20%, Wisconsin Electric Power Company (WEPCO) at 22%, Butters-Fetting Company, Inc. at 18%, and Grunau Company at 18%.

¶6    The jury determined that Gerald's damages would be fairly compensated at $195,163.55 for past medical, hospital, and funeral expenses, $5 million for pain and suffering prior to death, and $1.35 million for Carol's loss of society and companionship. The jury then determined that Pabst intentionally disregarded Gerald's rights and awarded $20 million in punitive damages specifically against Pabst.

¶7    Lorbiecki and Pabst filed post-trial motions. The circuit court granted Lorbiecki's motion to impute Sprinkmann's 20% liability under the verdict to Pabst because Pabst had a non-delegable duty under the safe place

---

[4] The record reflects testimony that Gerald was exposed to asbestos on premises owned by Wisconsin Electric Power Company (WEPCO), that the evidence in the case suggested that Gerald was employed by Butters-Fetting Company, Inc. at the time he was working at the Pabst site, and that he was employed by Grunau Company at the time he was working at the WEPCO site. These three entities were named defendants in Lorbiecki's lawsuit; however, through the course of litigation, the court entered a stipulated dismissal of these defendants.

statute to ensure its contractors did not negligently cause an unsafe condition on the premises. This resulted in the court finding that Pabst was liable for 42% of the compensatory damages.

¶8 Pabst argued that the circuit court should set aside the verdict because it was premised on an erroneous spoliation instruction, improperly admitted evidence, and insufficient proof on elements of a safe place statute violation. Pabst further argued that punitive damages should be denied. While the court declined to set aside the verdict, it granted Pabst's post-trial motion to reduce the damages in two ways. First, it applied the statutory cap on loss of society and companionship damages under WIS. STAT. § 895.04(4) and reduced that award to $350,000. Second, the court reduced the punitive damages award. "Punitive damages received by the plaintiff may not exceed twice the amount of any compensatory damages recovered by the plaintiff or $200,000, whichever is greater." WIS. STAT. § 895.043(6). The circuit court concluded that the punitive damages should be calculated as twice Pabst's apportionment of the compensatory damages.

¶9 The circuit court calculated compensatory damages as follows: $195,163.55 for medical and funeral expenses, $5 million for pre-death pain and suffering, and $350,000 for Carol's loss of society and companionship, which totaled $5,545,163.55. The court then allocated 42% of the liability to Pabst, equaling $2,328,968.69 in compensatory damages owed by Pabst. To calculate the punitive damages, the court doubled the compensatory damages allocated to Pabst, which equaled $4,657,937.38. The court entered a judgment of $6,986,906.07 against Pabst.

¶10  Pabst now appeals and Lorbiecki cross appeals. Additional facts are discussed below.

## DISCUSSION

¶11  Pabst makes five arguments on appeal, challenging the sufficiency of the evidence of an unsafe condition, errors in evidentiary rulings and jury instructions, the circuit court's decision to allow the jury to consider punitive damages, the court's decision to impute Sprinkmann's liability to Pabst, and the court's denial of Pabst's post-trial motion for JNOV. In the cross-appeal, Lorbiecki asserts that the circuit court erroneously interpreted the punitive damages statute and should have doubled the jury's award of compensatory damages. We address each claim below.

### I.    Pabst's claims on appeal

#### A.  Sufficiency of the evidence of an unsafe condition

¶12  We begin with Pabst's argument that there was insufficient evidence that an unsafe condition at Pabst's premises caused Gerald's injuries. Pabst asserts that the jury had to resort to speculation and conjecture to reach its verdict because there was no credible evidence to support the verdict.

¶13  "Our review of a jury's verdict is narrow." *Morden v. Continental AG*, 2000 WI 51, ¶38, 235 Wis. 2d 325, 611 N.W.2d 659. We view "the evidence in the light most favorable to a jury's verdict and must sustain the verdict if there is any credible evidence in the record to support it, regardless of whether there is evidence to support a different verdict." *Hoffmann v. Wisconsin Elec. Power Co.*, 2003 WI 64, ¶9, 262 Wis. 2d 264, 664 N.W.2d 55.

¶14 Wisconsin's safe place statute, WIS. STAT. § 101.11,[5] is a negligence statute that provides that an employer or property owner has a heightened, non-delegable duty to "repair or maintain the premises in as safe a condition as the nature of the premises reasonably permits." *McGuire v. Stein's Gift & Garden Ctr., Inc.*, 178 Wis. 2d 379, 398, 504 N.W.2d 385 (Ct. App. 1993); *Dykstra v. Arthur G. McKee & Co.*, 100 Wis. 2d 120, 130-31, 301 N.W.2d 201 (1981). The safe place statute "provides a higher duty than the duty of ordinary care regarding certain acts by employers and owners of places of employment or public buildings." *Mair v. Trollhaugen Ski Resort*, 2006 WI 61, ¶20, 291 Wis. 2d 132, 715 N.W.2d 598. "[T]he statute imposes three duties on employers and owners of places of employment or public buildings:  the duty to construct, to repair, and to maintain a safe place of employment or public building." *Barry v. Employees Mut. Cas. Co.*, 2001 WI 101, ¶20, 245 Wis. 2d 560, 630 N.W.2d 517.

¶15 To succeed on a safe place statute claim, Lorbiecki had to show (1) there was an unsafe condition on Pabst's premises; (2) the unsafe condition caused Gerald's injury; and (3) Pabst had either actual or constructive notice of the unsafe condition before Gerald's injury. *Correa v. Woodman's Food Mkt.*, 2020

---

[5] WISCONSIN STAT. § 101.11(1) provides that:

> Every employer … shall furnish a place of employment which shall be safe for employees therein and for frequenters thereof and shall furnish and use safety devices and safeguards, and shall adopt and use methods and processes reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters.  Every employer and every owner of a place of employment or a public building now or hereafter constructed shall so construct, repair or maintain such place of employment or public building as to render the same safe.

WI 43, ¶12, 391 Wis. 2d 651, 943 N.W.2d 535.  This court has previously held that airborne asbestos exposure as a result of repair or maintenance work on pipes covered in asbestos-containing insulation was an "unsafe condition" within the meaning of the safe place statute.  *Viola v. Wisconsin Elec. Power Co.*, 2014 WI App 5, ¶25, 352 Wis. 2d 541, 842 N.W.2d 515.

¶16     We begin with the record.  The jury was presented evidence on the health hazards of asbestos, the delivery of asbestos-containing material to Pabst, and Pabst's awareness of the risks prior to Gerald's work time.  Lorbiecki presented two expert witnesses, Drs. Brody and Holstein, who explained the health hazards from working with asbestos and the course of mesothelioma. Dr. Holstein, who reviewed sales records from Sprinkmann, described as 20,000-22,000 pages in total, testified that the records showed frequent, regular deliveries of asbestos-containing insulation to Pabst spanning longer than the time Gerald worked on the site.  This fact was confirmed in the video deposition of Wetzel, a delivery driver for Sprinkmann, who explained that he delivered asbestos-containing insulation to Pabst once a week for decades.  Kimes, Pabst's corporate representative, did not dispute that asbestos materials were delivered and used at the Pabst site, including during the time period when Gerald was working.  Kimes testified that there were "significant amounts" of insulation installed and replaced at Pabst.[6]

---

[6] The record also reflected that Pabst's facilities, including those for brewing, bottling, and storage, contained extensive piping systems, both insulated and not.  Kimes testified that "just based on the amount of piping that we need in a typical bottling house, there was miles and miles and miles of piping."

¶17    Further, Kimes testified about Pabst's knowledge of asbestos in the context of occupational safety and health.  He testified that Pabst became aware of the risk of asbestosis from asbestos exposure[7] no later than June 1971, dated to a memo circulated at Pabst detailing asbestos-related precautions employers were expected to take under Occupational Safety and Health Administration (OSHA) standards.  This meant Pabst had awareness of the health hazards posed by asbestos even if Kimes did not know when Pabst learned that asbestos caused mesothelioma.  Kimes reviewed the "Pabst plant rules and safety regulations" from October 1971, which called for good housekeeping and daily inspections of work areas, and made no mention of asbestos.  Kimes also reviewed an OSHA citation for the "bottle house"—the building where Gerald worked at Pabst—from April 1986, which stated that broken asbestos pipe insulation was found on the floor in February 1986.  Kimes stated that there was not documentation of asbestos abatement until the early 1990s.

¶18    Additionally, the record reflects that Lorbiecki presented testimony from Schroeder, a steamfitter at the Pabst site, who knew Gerald and worked with him for about four months at Pabst in the mid-1970s.  Schroeder testified that when a steamfitter needed to replace or repair an old insulated pipe prior to 1980, the steamfitter had to "take off the asbestos insulation which was done by a hammer or chisel, a saw, whatever you had in your hand; a screwdriver, pocket knife."  Schroeder explained that when he replaced piping at Pabst, he had to knock off old insulation:  some of it may have been asbestos but most of it was unidentified.  He testified that when he removed insulation to replace pipes, the

---

[7] Dr. Holstein explained in his testimony that asbestosis was a condition caused by asbestos exposure that "could cause death and disability through scarring of the lungs[.]"

insulation was visible, "flying around … basically dust." Schroeder testified that there was pipe insulation identified as asbestos-containing to be replaced with fiberglass, but he did not recall any warnings about cancer. Schroeder also explained that pipefitters and steamfitters generally performed similar work, that both removed and replaced insulated pipes and insulation around pipes, that both experienced similar working conditions while performing that work, and that this was true of his experience at Pabst.

¶19 The circuit court described Schroeder's testimony as "compelling evidence" that Gerald was removing asbestos-containing insulation and exposed to airborne asbestos at Pabst. Although Pabst argues that Schroeder never testified or claimed to have directly seen Gerald removing asbestos-containing insulation in the bottle house, the court held that Schroeder presented circumstantial evidence of routine practice for a pipefitter's actions at Pabst during this time. The court stated that under the jury instructions and WIS. STAT. § 904.06, "routine practice of an individual or entity acting in the same way during the incident or period in dispute is circumstantial evidence that they likely acted in that manner during the incident in dispute." Schroeder testified that based on his own work as a steamfitter, Gerald would have removed and replaced pipe and knocked off insulation as a regular part of his job as a pipefitter at Pabst.

¶20 We agree with the circuit court that Schroeder's testimony provided a basis for the jury to find that Gerald was exposed to an "unsafe condition" at Pabst. It is well established in Wisconsin law that a jury's finding "may rest upon evidence that is entirely circumstantial and that circumstantial evidence is oftentimes stronger and more satisfactory than direct evidence." *State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990). We reject Pabst's assertion that the jury had to resort to conjecture based upon Schroeder's

testimony to find that Gerald was exposed to an "unsafe condition" at Pabst's site. Schroeder had a reasonable foundation for his testimony, including his own experience at Pabst, his understanding of the activities that steamfitters and pipefitters performed as part of their jobs, and his knowledge of Gerald's work.

¶21 Pabst argues that to make a credible inference that Gerald was exposed to asbestos at Pabst, the jury had to speculate that several exculpatory inferences were not true, such as Gerald wearing protective equipment and only working on uninsulated pipes or with non-asbestos-containing insulation, or that Pabst had actual or constructive notice of the airborne asbestos in the bottle house before Gerald's exposure. However, Pabst's argument fails. "[I]f the evidence gives rise to more than one reasonable inference, we accept the particular inference reached by the jury." *Morden*, 235 Wis. 2d 325, ¶39. We will sustain the jury's verdict unless there was a "complete failure of proof" such that the verdict must have been based on speculation. *Hoffmann*, 262 Wis. 2d 264, ¶9. Although the jury could have accepted the chain of exculpatory inferences offered by Pabst, the fact that it reached a different conclusion does not make its decision speculation or conjecture.

¶22 Our examination of the record supports that there was credible evidence to support the jury's verdict that Pabst violated the safe place statute. First, there was credible evidence of an unsafe condition at Pabst arising out of the removal of asbestos-containing insulation in the bottle house. Second, there was no dispute that asbestos can cause mesothelioma, the illness Gerald developed that caused his death. Third, Kimes's testimony showed that Pabst had notice that asbestos was a health hazard as early as 1971, years before Gerald's work at Pabst. We "search the record for credible evidence that sustains the jury's verdict, not for evidence to support a verdict that the jury could have reached but did not."

*Morden*, 235 Wis. 2d 325, ¶39.  Here, the record reflects credible evidence to support the jury's verdict.  We therefore sustain it.

### B.  Errors in evidentiary rulings and jury instructions

¶23   We next turn to Pabst's argument about errors within the trial, particularly as it relates to Lorbiecki's efforts to prove that Pabst had knowledge or should have had knowledge of the dangers of asbestos before Gerald's work period.  First, we address the jury instruction on spoliation regarding Pabst's records that were destroyed or disposed of by a prior owner in 1985.  Second, we address the circuit court allowing Lorbiecki to introduce the purchase price that Pabst's current ownership group paid for Pabst in 2014.  Third, we address the circuit court admitting the legal complaints from three previous legal cases involving asbestos and mesothelioma at Pabst.

### 1.    Spoliation instruction

¶24   Pabst argues that the circuit court erred when it offered an evidence spoliation instruction that allowed, but did not require, the jury to draw a negative inference against Pabst based on a prior owner's decision to discard documents and computers in 1985.  We return to the record:  Lorbiecki questioned Kimes about Pabst's actions and ownership.  Kimes testified that in 2014, Blue Ribbon Holdings purchased Pabst from Dean Metropoulos Company, which purchased the company in 2010 from Paul Kalmanovitz, who had purchased the company in 1985, and it had been publicly traded before that.

¶25   Lorbiecki questioned Kimes about Pabst through the 1970s, asking if Pabst made efforts through lobbying to oppose worker safety laws.  Kimes responded that he did not know.  When asked about how he prepared to testify as

14

the corporate representative, Kimes stated that the documents he reviewed were limited to what had been transferred in the sale to the current ownership group, stating "[t]here's been many documents that have been destroyed, many documents that were not conveyed to us. So there are gaps in that history." Kimes acknowledged that in response to Lorbiecki's discovery request for documents related to the bottle house at the Milwaukee Pabst facility, Pabst produced only sixty-two pages of documents. In contrast, Lorbiecki questioned Kimes about 22,000 pages of Sprinkmann sales orders and documents related to Pabst's purchases.

¶26 Kimes testified that when Kalmanovitz bought Pabst in 1985, he ordered "[n]on-critical, non-essential documents … be destroyed" and all employees' computers be donated. Kimes stated that the current owner did not dispute having successor liability for Pabst and its facilities in the 1970s. Kimes stated that Pabst did not conduct asbestos remediation until the 1990s, several years after the documents and computers were discarded.

¶27 At the close of trial, the jury was instructed as follows:

> Evidence was adduced during this trial that during the ownership and at the direction of Mr. Kalmanovitz, Pabst destroyed documentary evidence and gave away computers which may or may not have contained relevant evidence. You may, but you are not required to, infer that Pabst did so because that material and information in the computers would have been unfavorable to their interest in any potential future litigation.

¶28 In its post-trial motions, Pabst also asserted that the spoliation instruction was unwarranted, arguing as it does on appeal, that there was no evidence or proof that the discarded records were related to Lorbiecki's work or possible asbestos litigation, or evidence that the destruction was intentional and

not negligent.  In its post-trial ruling, the circuit court found there was credible evidence to support the spoliation instruction.  The court concluded that the argument that there was no evidence of potential future asbestos litigation was without merit because of the "explosion of asbestos litigation" during that time.

¶29    "Courts have discretionary authority to sanction parties who destroy or withhold evidence relevant to pending or future litigation."  *American Fam. Mut. Ins. Co. v. Golke*, 2009 WI 81, ¶21, 319 Wis. 2d 397, 768 N.W.2d 729.  "We affirm discretionary rulings if the [circuit] court has examined the relevant facts, applied a proper standard of law, and, utilizing a demonstratively rational process, reached a conclusion that a reasonable judge could reach."  *Garfoot v. Fireman's Fund Ins. Co.*, 228 Wis. 2d 707, 717, 599 N.W.2d 411 (Ct. App. 1999).  Among its options to sanction a litigant, the circuit court may craft an instruction "permitting the jury to draw a negative inference from missing evidence" as a remedy.  *Id.* at 717-18.  A negative inference instruction may be appropriate when the litigant "violated its duty to preserve relevant evidence," *Golke*, 319 Wis. 2d 397, ¶42, and the destruction of evidence was the result of intentional conduct, not merely negligent conduct, *Mueller v. Bull's Eye Sport Shop, LLC*, 2021 WI App 34, ¶21, 398 Wis. 2d 329, 961 N.W.2d 112.[8]  We will sustain a jury instruction if

---

[8] We note that in the context of spoliation sanctions, intentional conduct is distinguished from bad faith or egregious conduct.  Egregious conduct means "a conscious attempt to affect the outcome of the litigation or a flagrant, knowing disregard of the judicial process."  *Milwaukee Constructors II v. Milwaukee Metro. Sewerage Dist.*, 177 Wis. 2d 523, 533, 502 N.W.2d 881 (Ct. App. 1993).  "[D]ismissal as a sanction for spoliation is appropriate only when the party in control of the evidence acted egregiously in destroying that evidence."  *American Fam. Mut. Ins. Co. v. Golke*, 2009 WI 81, ¶42, 319 Wis. 2d 397, 768 N.W.2d 729.  Dismissal was not raised as a possible sanction and therefore, our analysis considers intentional conduct required for an inference instruction.

it "comport[s] with the facts and [is] a correct statement of the law[.]" *Estate of Neumann v. Neumann*, 2001 WI App 61, ¶68, 242 Wis. 2d 205, 626 N.W.2d 821.

¶30 An element of a safe place statute claim is the property owner's knowledge or notice of defect before injury occurs. *Correa*, 391 Wis. 2d 651, ¶12. Although Pabst has argued repeatedly that there was no evidence in this case—of Gerald's work or of Pabst's safety policies—the circuit court found that by 1985 the danger of asbestos was clear, and the risk of litigation based upon it was strong. We agree with the circuit court's assessment that Kimes opened the door to considerations of spoliation because Kimes stated that the discarded documents and computers resulted in him being unable to answer questions about Pabst's company history, including its use of asbestos-containing insulation for piping and asbestos-related workplace safety practices in the 1970s. Pabst cannot rely upon the previous destruction of documents to argue that there is no evidence that supports Lorbiecki's claims without facing the corresponding possibility that the circuit court could allow the jury the option to form a negative inference from that discarded evidence.

¶31 Pabst argues that the circuit court did not examine the relationship between the missing evidence and the issues at trial. This argument is disingenuous. The issues at trial included when Pabst had notice of the risks of asbestos, its response, and its actions to preserve evidence for potential future litigation. The record reflects that Kimes testified to having an incredibly small number of documents for a company the size and age of Pabst. It is improbable that additional relevant documents had not existed that could show Pabst's actions in relation to safety, repair, maintenance, asbestos and non-asbestos insulation, and the materials, contractors, and workers engaged on site. We conclude that the

circuit court's decision to give a spoliation instruction was based upon the evidence in the record and the law and was within its discretion.

¶32 Pabst also argues that the spoliation instruction was inflammatory because it made Pabst look reckless, irresponsible, and intent on covering up damaging evidence, which most likely impacted the jury's determination of punitive damages. A spoliation instruction is a sanction designed "(1) to uphold the judicial system's truth-seeking function and (2) to deter parties from destroying evidence." *Insurance Co. of N. Am. v. Cease Elec. Inc.*, 2004 WI App 15, ¶16, 269 Wis. 2d 286, 674 N.W.2d 886, *aff'd*, 2004 WI 139, 276 Wis. 2d 361, 688 N.W.2d 462. The spoliation instruction offered here was reasonable and responsive to the evidence adduced at trial. The jury was instructed that it had the option to make a negative inference, but it was not obligated to do so. We are not persuaded that the jury was inflamed by this instruction.

### 2. *Admission of Pabst's purchase price in 2014*

¶33 Pabst argues that the circuit court erred when it admitted irrelevant evidence of the price that Pabst's current owner, Blue Ribbon Holdings, LLC, paid when it purchased Pabst in 2014 because that price was not relevant to Pabst's actions in the 1970s.[9] Lorbiecki argues that the purchase price was relevant to the knowledge of asbestos liability that Pabst's current ownership had at the time of purchase, because the ownership group likely knew what liabilities it was

---

[9] We note that Pabst's current ownership is referred to as Blue Ribbon Holdings, LLC and Blue Ribbon Intermediate Holdings. No party has argued that any difference between these entities is relevant to this dispute and we discuss it no further.

assuming in the purchase, as well as being relevant to the issue of punitive damages.

¶34    We return to the record:  Kimes testified that Blue Ribbon Holdings's 2014 purchase was for the brands and not any physical buildings, and as a private sale, the exact price was not public, but there were reports that the sale price was around $700 million.  Lorbiecki asked, "And so Blue Ribbon Holdings, LLC in 2014 had at least $700 million in resources to be able to determine what type of liability they were purchasing for the facility Pabst had previously owned; correct?"  Kimes responded, "That is correct."  Kimes also testified that Pabst did not dispute successor liability for the brewery including the bottle house in the 1970s.  Pabst objected to the line of questioning, but the circuit court overruled the objection.

¶35    "We review a circuit court's decision to admit or exclude evidence under an erroneous exercise of discretion standard."  *Martindale v. Ripp*, 2001 WI 113, ¶28, 246 Wis. 2d 67, 629 N.W.2d 698.  "If the circuit court applied the proper law to the pertinent facts and provided a reasonable basis for its ruling, we will conclude that the court acted within its discretion."  *Morden*, 235 Wis. 2d 325, ¶81.

¶36    Although Pabst argues that the purchase price is irrelevant and prejudicial, in the post-trial hearing, the circuit court found otherwise.  It stated that it considered the evidence clearly admissible "for likely knowledge of the risk of asbestos and removal of asbestos" and that a wealthy company was "more likely to have access to information in regard to those issues."  The court concluded that the record for introducing the evidence for the purpose of punitive damages "should have been better made," but it concluded that "the evidence was

relevant and admissible for both purposes."  The record reflects that Pabst repeatedly attempted to distinguish its current ownership from the ownership in the 1970s.  Lorbiecki argues that, in doing so, Pabst opened the door to the questions about the current ownership group and that the discussion of the purchase price connects to the current ownership group's knowledge.  We conclude that the circuit court acted within its discretion to admit the purchase price information as relevant to the current owner's knowledge of asbestos-related risks and their effect on its purchase of the Pabst brands.

¶37    Although we find that evidence was properly admitted; nevertheless, we address Pabst's argument that Lorbiecki's references to the purchase price were unfairly prejudicial.  Pabst argues that Lorbiecki portrayed Pabst as a large corporation "ripe for a big verdict" by raising the issue of the large purchase price and the company's wealth.  Lorbiecki made multiple references in closing arguments that a very large transaction like this $700 million acquisition, showed that the purchaser understood the liabilities related to the sale and further, that the damages had to be large to have an impact.  We "recognize[] the necessity for a reasonable latitude" in counsel's remarks and arguments to the jury.  *Fahrenberg v. Tengel*, 96 Wis. 2d 211, 228, 291 N.W.2d 516 (1980).  Lorbiecki's discussion of the purchase price was not a dominating theme or the focus of its lengthy closing argument.[10]

---

[10] We note three references to the purchase price in closing arguments:  First, the purchase price reflected the work of "lawyers around a table" to "understand[] the liabilities" the new ownership group would assume in the purchase.  Second, asking the jury to send a message to Pabst, arguing that "a small amount does not get through to people that buy and sell companies for $700 million."  Third, "this is a company that bought Pabst for $700 million and then they just asked you to put a value of pain and suffering being suffocated to death as $400,000."

¶38 Further, with punitive damages on the special verdict form, it was reasonable for Lorbiecki to comment on the financial resources of the defendant based on the evidence in the record.[11] *See id.* at 226 (discussing instructing a jury to "consider the defendant's wealth so far as it appears from the evidence"). We conclude that these comments "did not cause the jury to reach a decision that it would not have reached otherwise." *Seifert v. Balink*, 2017 WI 2, ¶163, 372 Wis. 2d 525, 888 N.W.2d 816. We therefore reject Pabst's argument that this information was so unfairly prejudicial to require a new trial.

¶39 Finally, Pabst complains that at the time the evidence was admitted, the circuit court had not determined that Lorbiecki had made a prima facie case to put the question of punitive damages before the jury. We conclude that the purchase price evidence was admitted as relevant to the discussion of corporate knowledge of asbestos-related risk related to Pabst's 2014 purchase. Lorbiecki's later use of that admitted evidence was not improper. As discussed below, a prima facie case for punitive damages was established by the close of evidence; therefore, it was proper for Lorbiecki to use this evidence in closing arguments with respect to punitive damages.

---

[11] Pabst further asserts that the 2014 sales price is not indicative of the current value of the company and that in any case, the defendant's net worth is the relevant measure for punitive damages. *See Welty v. Heggy*, 145 Wis. 2d 828, 835, 429 N.W.2d 546 (Ct. App. 1988) (discussing that when "the assessment of punitive damages takes into account the defendant's wealth, then that wealth must be measured by net worth," because "[a]ny other measure is illusory"). We note that the jury instructions provide for the jury to consider a defendant's "ability to pay" and "the defendant's wealth" as factors in the determination of punitive damages. WIS JI—CIVIL 1707. The Supreme Court of Wisconsin has also concluded that "[n]et worth may not in all instances be the best measure of an individual's ability to respond in damages. We believe a more accurate gauge is his financial resources, which include his earnings as well as his net worth." *Jones v. Fisher*, 42 Wis. 2d 209, 221, 166 N.W.2d 175 (1969). Pabst did not introduce alternative evidence for the jury to consider and we decline to further address the net worth argument.

### 3.     Evidence of other mesothelioma cases at Pabst

¶40     Pabst argues that the circuit court erred when it admitted evidence of allegations in three prior legal cases that other workers at Pabst had been diagnosed with mesothelioma.  We return to the record.  Lorbiecki questioned Dr. Holstein if he knew of other mesothelioma cases at Pabst and offered as evidence the complaints from three other mesothelioma cases against Pabst.  Pabst objected that the proffered other legal cases were irrelevant and may not be similar to Lorbiecki's case.[12]  The court overruled Pabst's objections and admitted the evidence.

¶41     Pabst argues that the circuit court erroneously exercised its discretion because it failed to apply the proper legal standard for assessing "other incident" evidence before admitting the evidence.  Pabst argues that the court did not examine whether the work performed by those plaintiffs in the cases was "sufficiently similar" to the work performed by those plaintiffs and Gerald to be relevant and probative.

¶42     As discussed above, the circuit court admits evidence at its discretion.  *Martindale*, 246 Wis. 2d 67, ¶28.  Admitted evidence must be relevant, under WIS. STAT. § 904.01, meaning that "it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Nowatske*

---

[12] Lorbiecki introduced three cases by name.  The evidence consisted of the complaints from three lawsuits.  We reference materials available from those cases:  *Ahnert v. Emps. Ins. Co. of Wausau*, No. 13-C-1456, 2016 WL 97731 (E.D. Wis. Jan. 7, 2016); *Peter v. Sprinkmann Sons Corp.*, 2015 WI App 17, 360 Wis. 2d 411, 860 N.W.2d 308; *Summons and complaint*, *Von Till v. Armstrong Int'l, Inc.*, No. 1722-CC11890 (Cir. Ct. of City of St. Louis County, MO, filed Dec. 6, 2017).

*v. Osterloh*, 201 Wis. 2d 497, 503, 549 N.W.2d 256 (Ct. App. 1996). Additionally, "evidence of … the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the … organization on a particular occasion was in conformity with the … routine practice." WIS. STAT. § 904.06(1).[13]  In assessing the relevance of evidence, we consider both whether the "evidence relates to a fact or proposition that is of consequence to the determination of the action" and "whether the evidence has probative value[.]" *State v. Sullivan*, 216 Wis. 2d 768, 772, 576 N.W.2d 30 (1998).  However, "relevant[] evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice" to the defendant.  WIS. STAT. § 904.03.

¶43     Lorbiecki moved to admit the other mesothelioma cases in support of its questioning of its expert witness on whether multiple mesothelioma cases had occurred at Pabst and whether that was significant to exposure and causation. In its post-trial ruling, the circuit court concluded that "there was clearly sufficient similarity in the other Pabst exposure cases" to admit that evidence as "compelling circumstantial evidence of exposure and cause."  We conclude that evidence of other mesothelioma occurrences could be relevant to show routine practices at Pabst.  *See French v. Sorano*, 74 Wis. 2d 460, 466, 247 N.W.2d 182 (1976).

---

[13] Lorbiecki relies on cases establishing a general rule that prior, similar incidents at the same place or under similar conditions were admissible at the circuit court's discretion, under WIS. STAT. § 904.06.  *See e.g.*, *Lobermeier v. General Tel. Co. of Wis.*, 119 Wis. 2d 129, 150, 349 N.W.2d 466 (1984) (discussing admission of evidence of "ten incidents involving personal injuries as the result of improperly grounded telephones" in a negligence action where the plaintiff alleged injury from an ungrounded telephone); *Netzel v. State Sand & Gravel Co.*, 51 Wis. 2d 1, 9-10, 186 N.W.2d 258 (1971) (discussing admitting evidence that "seven other employees had been burned by the same concrete mix on the same day on the same job" as the injured plaintiff in a dangerous defect action).

¶44 Pabst next argues that the other mesothelioma cases did not establish that those plaintiffs' work was sufficiently similar to Gerald's work. Pabst pointed out that while Gerald worked in the bottle house at Pabst for four months in the mid-1970s—Ahnert worked within Pabst much earlier, in 1959; Peter worked there much longer, over thirty-six years extensively in the bottle house; and Von Till did not identify when or for how long he worked at the Milwaukee Pabst facility in the course of his thirty-one-year career that took him to at least seventeen breweries. Lorbiecki argues that this evidence rebuts Pabst's defense that there was insufficient proof of asbestos exposure at Pabst and of Gerald's exposure in the bottle house. We conclude that the complaints in the other mesothelioma cases were probative to the question of whether disturbed asbestos was present at Pabst, and that those complaints were sufficiently similar to be relevant. Having met the threshold of admissibility, the relevant weight to be given to these three cases was up to the jury. *State v. Jones*, 2018 WI 44, ¶31, 381 Wis. 2d 284, 911 N.W.2d 97 (explaining that the circuit court determines admissibility of evidence, while the jury determines the weight of that admissible evidence in its fact-finding); *French*, 74 Wis. 2d at 466 ("Any lack of evidence as to the conduct on a particular occasion is not a question of admissibility, but sufficiency.").

¶45 Finally, we reject Pabst's argument that unfair prejudice from the other mesothelioma cases outweighed the probative value. The record does not reflect that Lorbiecki used these cases to inflame the jury. Pabst asserts the evidence of other cases was highly prejudicial because Dr. Holstein, when discussing whether it could be a coincidence that there were multiple mesothelioma cases at Pabst, compared the situation to multiple asteroids landing on your property—rare and not a coincidence. However, the circuit court

24

specifically struck the reference to asteroids and instructed the jury to disregard all stricken testimony. "Jurors are presumed to follow the court's instructions." *State v. Adams*, 221 Wis. 2d 1, 12, 584 N.W.2d 695 (Ct. App. 1998). Therefore, we reject Pabst's argument that the jury's decision was inflamed by the prior cases.

¶46 Ultimately, the circuit court considered the relevant facts, examined the evidence under the proper standards of law, and reached a decision that a reasonable court could reach. *Morden*, 235 Wis. 2d 325, ¶81. Therefore, we conclude that the circuit court's decision to admit the complaints in the other Pabst mesothelioma cases was within its discretion.

### C. Allowing the jury to consider punitive damages

¶47 Pabst argues that the circuit court failed in its gatekeeping function when it allowed the question of punitive damages to reach the jury. "The plaintiff may receive punitive damages if evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff." WIS. STAT. § 895.043(3). A circuit court should only send the question of punitive damages to a jury "when the conduct is so aggravated that it meets the elevated standard of an 'intentional disregard of rights[.]'" *Strenke v. Hogner*, 2005 WI 25, ¶42, 279 Wis. 2d 52, 694 N.W.2d 296 (citation omitted). A plaintiff must show by "clear and convincing evidence" that the defendant "was aware that its conduct was substantially certain to result in the plaintiffs' rights being disregarded." *Wischer v. Mitsubishi Heavy Indus. Am., Inc.*, 2005 WI 26, ¶34, 279 Wis. 2d 4, 694 N.W.2d 320. Whether there was sufficient evidence to submit the question of punitive damages to the jury is a question of law we review independently. *Id.*, ¶32.

¶48     Pabst argues that to prove that Pabst intentionally disregarded Gerald's rights, Lorbiecki had to show that Pabst (1) knew its contractors were removing asbestos contrary to OSHA rules; (2) knew its contractors were not protecting their employees pursuant to Pabst's instructions; and (3) despite that knowledge, deliberately, not just negligently, chose to do nothing to protect those workers.  Pabst asserts there is no evidence of any of these situations.

¶49     Lorbiecki argues that the circuit court correctly determined that there was clear and convincing evidence to support submitting punitive damages to the jury.  Lorbiecki asserts that Pabst knew of the dangers of inhaling airborne, disturbed asbestos years before Gerald arrived on Pabst's premises, as demonstrated by Kimes's admission and the 1971 memo stating that OSHA regulations required Pabst to control asbestos exposures on its premises, monitor exposure levels, and implement precautions to protect workers.  Lorbiecki then asserts that despite its own safety manual from 1971 providing for daily inspections for work areas, Schroeder's testimony provided circumstantial evidence of the uncontrolled removal of asbestos pipe insulation in a manner that caused airborne asbestos dust in the bottle house.

¶50     Based on our examination of the record, we conclude that Lorbiecki presented clear and convincing evidence that prior to Gerald's work at Pabst, it was aware of the dangers of asbestos and yet workers were unsafely exposed to disturbed asbestos.[14]  An intentional disregard of rights "necessitates that the

---

[14] We note that Pabst argues that there was insufficient evidence of the uncontrolled removal of asbestos-containing insulation, arguing that Lorbiecki overstated the record.  As discussed in the sufficiency of the evidence section above, Schroeder's testimony provided evidence of the treatment of asbestos-containing materials at Pabst in the mid-1970s and provided circumstantial evidence of Gerald's exposure.  A jury's finding "may rest upon evidence that is entirely circumstantial[.]"  *State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990).

defendant act with a purpose to disregard the plaintiff's rights or be aware that his or her conduct is substantially certain to result in the plaintiff's rights being disregarded." *Strenke*, 279 Wis. 2d 52, ¶36. An "intentional disregard of rights" must be a deliberate "course of conduct." *Id.*, ¶38. The rights at issue include the "right to safety, health or life[.]" *Id.* The record reflects Pabst disregarded Gerald's right to safety and health in his workplace. Accordingly, we conclude that there was clear and convincing evidence to put the question of punitive damages to the jury.

### D. Imputing Sprinkmann's liability to Pabst

¶51 Pabst argues that the circuit court erred when it granted Lorbiecki's post-trial motion to impute Sprinkmann's liability to Pabst. The record reflects Kimes testified that Pabst contracted with Sprinkmann as its exclusive provider of insulation until 1979, and he acknowledged that Sprinkmann provided vast quantities of asbestos-containing insulation to Pabst over a long period of time. The deposition testimony of Wetzel and Van Beck, a vice president of Sprinkmann, showed that Sprinkmann had an employee on site regularly at Pabst and was involved in the supply, repair, and removal of pipe insulation. In its post-trial ruling, the circuit court concluded that Pabst delegated a specific duty to Sprinkmann within its safe place statute duties: "[T]he duty to … provide safe insulation materials and safely install, remove and repair that insulation," which it concluded Sprinkmann and other contractors failed to do.

¶52 "The duties imposed on employers and property owners under the safe place statute are non-delegable." *Barry*, 245 Wis. 2d 560, ¶42. "Under any circumstance, it is the owner or the employer who must answer to the injured party." *Dykstra*, 100 Wis. 2d at 132. As a practical matter, this means that Pabst

could not avoid liability for a breach of the duty by asserting that it delegated its responsibility under the safe place statute to a contractor which would cause that contractor "to be substituted as the primary defendant[.]" *Id.*

¶53     An examination of *Barry* is illustrative.  A project manager, Barry, working for a general contractor on an Ameritech property was injured on site when he fell down stairs; another subcontractor had been engaged to repair and maintain those stairs after there had been reports of loose carpeting snagging people.  *Id.*, 245 Wis. 2d 560, ¶¶4-7.  The subcontractor installed vinyl nosing strips on the stairs in 1991 and Barry was injured in 1993, after which an investigation into the stairs showed that several of the nosing strips had become loose.  *Id.*, ¶¶5, 7-8.  The jury apportioned liability at 45% for Ameritech, 45% for the stairs subcontractor, and 10% for Barry.  *Id.*, ¶11.  Although the case was remanded for a new trial on a different basis, our supreme court held that Ameritech's duty under the safe place statute was non-delegable, and therefore, it must answer to Barry for any violation, regardless of whether another party contributed to the violation.[15]  *Id.*, ¶43.

¶54     Pabst argues *Barry* is not applicable to the situation with Sprinkmann because it did not engage Sprinkmann to specifically fulfill its statutory duties under the safe place statute.  Instead, Pabst contends that having Sprinkmann deliver insulation did not mean that Sprinkmann took on safe place statute duties to ensure the safe removal of asbestos-containing insulation from

---

[15] Similarly, although Pabst may have contribution rights against Sprinkmann to the extent of Sprinkmann's negligence, those rights do not diminish the nature of Pabst's statutory duty to Gerald.  *See Barry v. Employers Mut. Cas. Co.*, 2001 WI 101, ¶42, 245 Wis. 2d 560, 630 N.W.2d 517.

pipes. Pabst's argument fails because it appears to ask us to determine that Pabst did not delegate certain duties, which is not a fact question asked of the jury and contradicts the conclusion of the circuit court.

¶55 More importantly, Pabst's attempt to avoid the imputation of Sprinkmann's liability asks us to ignore the purpose of the safe place statute. Under Wisconsin law, Pabst has the duty to construct, to repair, and to maintain a safe place of employment or public building. WIS. STAT. § 101.11(1). Because the property owner's duty under the safe place statute is non-delegable, Pabst must answer to Lorbiecki "for any violation of that duty regardless of whether another party contributed to the violation." *Barry*, 245 Wis. 2d 560, ¶43. It does not diminish Pabst's ultimate duty under the safe place statute that the jury was asked to apportion the negligence attributable to each entity on the special verdict, nor does the jury's finding that Sprinkmann was 20% liable negate Pabst's ultimate responsibility for its work place. *See id.*, ¶44.

¶56 Moreover, Wisconsin law supports imputing Sprinkmann's negligence to Pabst as a result of the safe place statute claim. "The duty of defendant to furnish a reasonably safe working place being absolute, if such duty be delegated by the master to another, negligence in that regard by such other will be imputed to the master." *Driscoll v. Allis-Chalmers Co.*, 144 Wis. 451, 460, 129 N.W. 401 (1911). In other words, Pabst has an absolute duty to furnish a safe place of employment. If Pabst invites another entity to its premises, such as by contract to supply, repair, and remove asbestos-containing insulation, and then that entity contributes to the unsafe condition of Pabst's property, then the second entity's negligence is imputed to Pabst. Therefore, we conclude that the jury's apportionment of 20% negligence by Sprinkmann was properly imputed to Pabst by the circuit court.

*E. Denying Pabst's post-trial motion for JNOV*

¶57    Pabst's final argument is that the circuit court should have entered judgment notwithstanding the verdict in Pabst's favor because Lorbiecki's claim was legally insufficient for two reasons.  First, Pabst argues that even if Gerald was exposed to asbestos, it resulted from "acts of operation" of Gerald's own recklessness or negligence that falls outside of the safe place statute.  Second, Pabst argues that as the employee of an independent contractor, Lorbiecki cannot sue Pabst "in tort."  We conclude that neither issue compels JNOV.

¶58    "[A] JNOV motion assumes that a jury verdict is supported by sufficient evidence, but asserts that judgment should be granted to the moving party on grounds other than those decided by the jury." *Dakter v. Cavallino*, 2014 WI App 112, ¶16, 358 Wis. 2d 434, 856 N.W.2d 523, *aff'd*, 2015 WI 67, 363 Wis. 2d 738, 866 N.W.2d 656; WIS. STAT. § 805.14(5)(b).  Because it presents a question of law, we independently review the circuit court's decision on a JNOV motion.  *Management Comput. Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 177, 557 N.W.2d 67 (1996).

1.    *The "acts of operation" exception to the safe place statute*

¶59    First, as Pabst acknowledges, this court concluded in *Viola* that the "acts of operations" exception to the safe place statute—in which the plaintiff's own recklessness or negligence is a cause of the unsafe condition—was too attenuated to apply to Viola's asbestos-related claim.  *Id.*, 352 Wis. 2d 541, ¶24.  Pabst argues that *Viola* was incorrectly decided and that we should rely upon a Supreme Court of Wisconsin holding that the safe place statute refers to an "unsafe condition" at a place of employment, not "an act in the process of taking

place." *Stefanovich v. Iowa Nat. Mut. Ins. Co.*, 86 Wis. 2d 161, 167, 271 N.W.2d 867 (1978) (citation omitted).[16] Pabst argues that Gerald's removal of asbestos-containing insulation was a "negligent or inadvertent act" and not an unsafe condition of the premises. *See id.*, at 171.

¶60 In *Viola*, we made the distinction that the safe place statute applied when asbestos was necessarily disturbed in the course of the regular maintenance or repair of a structure, resulting in injury to the plaintiff. *Id.*, 352 Wis. 2d 541, ¶25. The same distinction applies in this case. Further, Pabst has presented a legal argument that would require us to conclude that *Viola* was incorrectly decided, an action the court of appeals cannot take. Only the Supreme Court of Wisconsin has "the power to overrule, modify or withdraw language from a published opinion of the court of appeals." *Cook v. Cook*, 208 Wis. 2d 166, 190, 560 N.W.2d 246 (1997) (holding that the court of appeals is a unitary court that primarily has an error-correcting function). We conclude that this JNOV argument fails and we decline to further address the issue.

### 2. Tort liability for injuries to an independent contractor's employee

¶61 Pabst's second argument is that the rule that "a principal employer is not liable in tort for injuries sustained by an independent contractor's employee while he or she is performing the contracted work" should be expanded to apply to safe place statute claims. *See Tatera v. FMC Corp.*, 2010 WI 90, ¶2, 328 Wis. 2d

---

[16] Notably, in so arguing, Pabst ignores that the removal of asbestos insulation created airborne asbestos, an unsafe condition, to which other employees and frequenters were exposed, distinct from the act of removing the insulation. Pabst does not discuss this unsafe condition in the context of its challenge to *Viola v. Wisconsin Elec. Power Co.*, 2014 WI App 5, 352 Wis. 2d 541, 842 N.W.2d 515.

320, 786 N.W.2d 810. The circuit court dismissed Lorbiecki's negligence claim under this rule, but allowed the safe place statute claim to go to trial.[17]

¶62     *Tatera* analyzed duties under common law negligence in the context of an independent contractor's employee's remedies for injuries on the job, beginning with Wisconsin's worker's compensation statutes providing "the exclusive remedy against the employer" for an injured employee. WIS. STAT. § 102.03(2). The *Tatera* court concluded that "a principal employer should be generally protected from such tort liability because it has already assumed financial responsibility for injuries to the independent contractor's employees" through the contract between the principal and independent contractor. *Id.*, 328 Wis. 2d 320, ¶16. Accordingly, Gerald's status as an employee of a contractor working for Pabst negated a remedy in common law negligence under *Tatera*.

¶63     However, Gerald's safe place claim is distinguishable. "The standard of care that the safe[]place statute establishes is a higher standard of care than that which the law imposes through common-law negligence." *Megal v. Green Bay Area Visitor & Convention Bureau, Inc.*, 2004 WI 98, ¶22, 274 Wis. 2d 162, 682 N.W.2d 857. The safe place statute imposes a duty on employers and owners of places of employment "to their employees and their frequenters." *Gennrich v. Zurich Am. Ins. Co.*, 2010 WI App 117, ¶16, 329 Wis. 2d 91, 789 N.W.2d 106 (emphasis omitted). "An employee of an independent contractor doing work on the premises is a frequenter working in a

---

[17] The United States District Court for the Eastern District of Wisconsin also concluded that *Tatera v. FMC Corp.*, 2010 WI 90, 328 Wis. 2d 320, 786 N.W.2d 810, would not bar a safe place statute claim in *Anderson v. Proctor & Gamble Paper Prod. Co.*, 924 F. Supp. 2d 996, 1003 (E.D. Wis. 2013). Although Pabst is critical that the circuit court relied upon *Anderson* in its reasoning, we note that mandatory Wisconsin authority compels the same result.

place of employment." ***Hortman v. Becker Const. Co.***, 92 Wis. 2d 210, 226, 284 N.W.2d 621 (1979).

¶64      Consistent with this understanding, "the safe place statute addresses unsafe conditions and common law [negligence] addresses negligent acts." ***Gennrich***, 329 Wis. 2d 91, ¶23.  Lorbiecki alleged a claim for a safe place statute violation for an unsafe condition resulting in Gerald's injuries.  Under the holdings in ***Viola***, which we have no reason or authority to challenge, airborne asbestos constituted an unsafe condition on the premises at Pabst.  ***Id.***, 352 Wis. 2d 541, ¶25.; ***Cook***, 208 Wis. 2d at 190.

¶65      Thus, a violation of the safe space statute falls outside the scope of ***Tatera*** because such a claim is not based on a violation of common law duties, but instead on the safe place duties owed to employees and frequenters.  Pabst fails to show how ***Tatera's*** rule concerning common law negligence duties would negate its heightened, non-delegable duty under the safe place statute.  *See **Barry***, 245 Wis. 2d 560, ¶42.  We conclude that ***Tatera*** does not bar Lorbiecki's safe place statute claim.  Pabst has failed to establish a legal insufficiency under ***Tatera*** in Lorbiecki's safe place statute claim.  Accordingly, this JNOV argument fails.

##### II.      *Lorbiecki's cross-appeal*

¶66      Lorbiecki cross-appeals the order of judgment on the issue of the calculation of punitive damages.  Lorbiecki argues that the circuit court erred in its application of the punitive damages statute, WIS. STAT. § 895.043, specifically subsection (6) which provides that "[p]unitive damages received by the plaintiff may not exceed twice the amount of any compensatory damages recovered by the

plaintiff[.]"[18]   First, Lorbiecki asserts the circuit court ignored that punitive damages are not governed by comparative negligence law.[19] *Tucker v. Marcus*, 142 Wis. 2d 425, 436, 418 N.W.2d 818 (1988).  Second, Lorbiecki argues that the circuit court misapplied the meaning of "recovered" in § 895.043(6).

¶67   We review the facts.  The jury attributed liability to five entities on the verdict and awarded $6,545,163.55 in compensatory damages.[20]  It also found that Pabst intentionally disregarded Gerald's rights and awarded $20 million in punitive damages against Pabst.  The circuit court applied the statutory cap of $350,000 on loss of society and companionship damages, under WIS. STAT. § 895.04(4), and reduced the total compensatory damages to $5,545,163.55.[21]  After imputing Sprinkmann's liability to Pabst, the court found Pabst liable for 42% of the compensatory damages, for a total of $2,328,968.69.  It then addressed the punitive damage award.  With consideration of the statutory cap imposed by WIS. STAT. § 895.043(6), and the court set the punitive damages at double Pabst's

---

[18] Although WIS. STAT. § 895.043(6) was created in 2011, this issue presents a case of first impression.  *See* 2011 Wis. Act 2 § 23M.

[19] WISCONSIN STAT. § 895.045 sets forth the law on contributory negligence.  In its comparative negligence subsection, it provides that "[t]he liability of each person found to be causally negligent whose percentage of causal negligence is less than 51 percent is limited to the percentage of the total causal negligence attributed to that person."  Sec. 895.045(1).

[20] As discussed above, the jury's award of compensatory damages totaled $6,545,163.55.  This amount was calculated as:  $195,163.55 for medical and funeral expenses, $5 million for pre-death pain and suffering, and $1.35 million for Carol's loss of society and companionship.

[21] We note that the record is not clear how or when the circuit court applied the statutory cap on the jury's $1.35 million award for loss of society and companionship.  The apportionment of damages should occur first, but in this case Pabst's 42% of liability on the $1.35 million would equal approximately $567,000, at which point the statutory cap would apply.  Therefore, the compensatory damages owed by Pabst were correctly determined.  *See Chang v. State Farm Mut. Auto. Ins. Co.*, 182 Wis. 2d 549, 566, 514 N.W.2d 399 (1994) (providing the method of applying the percentage of comparative fault before the application of any statutory maximums).

share of the compensatory damages, equaling $4,657,937.38. The court entered a total judgment of $6,986,906.07.

¶68    Lorbiecki argues that the circuit court erred when it concluded that the punitive damages must be limited in a ratio to Pabst's apportioned share of the compensatory damages. Lorbiecki contends that the punitive damages should instead have been capped at $13,090,327.10, which equals double the compensatory damages awarded by the jury, and not $4,657,937.38, as the court concluded.

¶69    First, Lorbiecki argues that we must interpret the punitive damages statute in compliance with *Tucker*, 142 Wis. 2d 425. Our supreme court discussed that "Wisconsin has repeatedly recognized that the purposes of punitive damages and compensatory damages are distinct[.]" *Id.* at 454. While compensatory damages must be apportioned under the "statutory scheme of comparative fault" under WIS. STAT. § 895.045, "the policy of punishing outrageous conduct by awarding, where available, punitive damages [is] undiminished by proportional negligence." *Tucker*, 142 Wis. 2d at 452. The Supreme Court of Wisconsin "expressly decline[d] to adopt an interpretation of section 895.045 under which punitive damages would be deemed 'damages for negligence' and, as such, subject to proportionate reduction." *Tucker*, 142 Wis. 2d at 454. Lorbiecki contends that under that holding, the circuit court erred when it calculated the cap of punitive damages was double Pabst's apportioned share of liability.

¶70    Second, the parties disagree about the meaning of the word "recovered" in WIS. STAT. § 895.043(6). Pabst argues that the circuit court correctly determined that "compensatory damages recovered by the plaintiff" is limited to those compensatory damages that Lorbiecki can legally obtain from

Pabst in this lawsuit. Conversely, Lorbiecki argues that "recovered" refers to the entire compensatory damages award against all parties liable to Lorbiecki before the application of any statutory caps.

¶71    To resolve this issue, we must interpret the punitive damages statute, WIS. STAT. § 895.043. "[T]he purpose of statutory interpretation is to determine what the statute means so that it may be given its full, proper, and intended effect." ***State ex rel. Kalal v. Circuit Ct. for Dane Cnty.***, 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110. We "apply the ordinary and accepted meaning of language" when we interpret a statute. ***Seider v. O'Connell***, 2000 WI 76, ¶32, 236 Wis. 2d 211, 612 N.W.2d 659. If the meaning is plain, then our inquiry ordinarily stops. ***Kalal***, 271 Wis. 2d 633, ¶45. The interpretation of a statute is a question of law that we review independently. ***Waranka v. Wadena Ins. Co.***, 2014 WI 28, ¶15, 353 Wis. 2d 619, 847 N.W.2d 324.

¶72    The circuit court and Pabst relied upon ***Nelson v. McLaughlin***, 211 Wis. 2d 487, 565 N.W.2d 123 (1997), in which the Wisconsin Supreme Court interpreted the term "amount recovered" in WIS. STAT. § 807.01(4),[22] which governs interest on rejected offers of settlement when the party recovers an amount larger than the settlement offer. Our supreme court held "that 'amount recovered' in § 807.01(4) means that portion of the verdict for which a party is

---

[22] In the statute on settlement offers, WIS. STAT. § 807.01(4) provides:

> If there is an offer of settlement by a party under this section which is not accepted and the party recovers a judgment which is greater than or equal to the amount specified in the offer of settlement, the party is entitled to interest [under a statutory formula] … on the amount recovered from the date of the offer of settlement until the amount is paid.

responsible, i.e., the judgment entered against the party, not including double costs." *Nelson*, 211 Wis. 2d at 505.  Therefore, Pabst contends "the amount of any compensatory damages recovered by the plaintiff" in WIS. STAT. § 895.043(6) would be limited to the compensatory damages for which Pabst has been deemed responsible.  Pabst argues that only after that amount is determined does the circuit court apply the statutory doubling rule for the cap on punitive damages.

¶73    Lorbiecki argues that *Nelson* does not provide compelling guidance for interpreting the punitive damages statute because, as *Nelson* emphasized, its interpretation was dictated by different phrases within the settlement offer statute, namely the use of "judgment" and "amount recovered" in the same sentence.  *Id.*, 211 Wis. 2d at 498-99, 510.  Thus, on the specific terms and their usage within this statute, the *Nelson* court concluded that "judgment" and "amount recovered" should not be interpreted to have the same meaning.  That is not the case in WIS. STAT. § 895.043(6).  *Nelson* also was guided by WIS. STAT. § 814.04(4), which provided the calculation of "interest on [a] verdict" and explicitly differentiated its rules from WIS. STAT. § 807.01(4).  *Nelson*, 211 Wis. 2d at 500.  We agree that the punitive damages statute does not address the same issues as raised in *Nelson*.[23]

¶74    We further reject Pabst's argument because it ignores the statutory context of punitive damages statute.  "[S]tatutory language is interpreted in the

---

[23] We observe that the conclusion in *Nelson* was also driven by potential unreasonable results if "amount recovered" were interpreted to mean the entire verdict amount as opposed to the amount of liability assessed against a particular defendant—e.g., unreasonably forcing insurers to accept pretrial settlement offers rather than risk substantial liability for interest even where the insurer's liability is questionable or the appropriate amount of damages is highly debatable.  *Nelson v. McLaughlin*, 211 Wis. 2d 487, 502-03, 565 N.W.2d 123 (1997).  No such concerns exist here.

context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." *Kalal*, 271 Wis. 2d 633, ¶46. Pabst and the circuit court's attempt to define "amount recovered" through a statute on interest relating to settlement offers fails to consider this term in the context of the punitive damages statute or WIS. STAT. ch. 895.[24]

¶75 In contrast, Lorbiecki argues that the circuit court failed to consider the plain and ordinary meaning of the language of the statute. Lorbiecki asserts that at plain meaning, "the amount of any compensatory damages recovered by the plaintiff" would refer to the jury's determination of compensatory damages. Lorbiecki argues that "recovered" is not the equivalent of a payment or a receipt, but a right of relief. Lorbiecki relies on Black's Law Dictionary, which offers multiple definitions of "Recover" including "[t]o get back or regain in full or in equivalence" and "[t]o obtain (relief) by judgment or other legal process." *Recover*, BLACK'S LAW DICTIONARY (11th ed. 2019).[25]

¶76 We conclude that within the context of chapter 895, "recover" and "recovery" are understood in the ordinary and accepted meaning of obtaining relief through legal process. *See Recover*, WEBSTER'S THIRD NEW

---

[24] Recover (and recovery) are frequently used throughout WIS. STAT. ch. 895 on damages. Examples include when a party may recover damages in certain wrongful death actions, WIS. STAT. §§ 895.03, 895.031. There are limits on what may be recovered from parents whose minor child commits certain acts. WIS. STAT. § 895.035. The contributory negligence statute sets forth a framework on what may be recovered in negligence actions depending on the plaintiff's own negligence, the comparative fault of multiple tortfeasors, and product liability. WIS. STAT. § 895.045.

[25] Lorbiecki also relies on "Recovery" as defined as "[t]he regaining or restoration of something lost or taken away" or "[t]he obtainment of a right to something (esp. damages) by a judgment or decree." *Recovery*, BLACK'S LAW DICTIONARY (11th ed. 2019).

INTERNATIONAL DICTIONARY (unabr. 1993) (offering definitions that include "to get or win back"; "to gain by legal process"; or "to obtain a final judgment in one's favor").

¶77 While Pabst argues that the plain meaning of "amount recovered" is the recovery that the plaintiff will obtain from a particular defendant, this construction falsely limits the plain meaning of "recovered." "We will not read into the statute a limitation the plain language does not evidence." *County of Dane v. LIRC*, 2009 WI 9, ¶33, 315 Wis. 2d 293, 759 N.W.2d 571. The plain language of the statute does not support Pabst's interpretation.

¶78 We conclude that within the punitive damages statute, "the amount of any compensatory damages recovered by the plaintiff" is fixed in relation to the plaintiff's recovery—not to an amount connected to any particular defendant's liability or the plaintiff's recovery from any particular defendant. "Recover" is not the same as "receive a payment;" moreover, the statute here does not address any practicalities of collecting a judgment. A plaintiff's recovery arises out of the calculation of compensatory damages, even if a plaintiff may never touch a fraction of that amount due to other factors.

¶79 In conjunction with *Tucker*'s distinction that damages from negligence were affected by apportionment but punitive damages were not, we conclude that the clause "amount of any compensatory damages recovered" in WIS. STAT. § 895.043(6) means the total amount of compensatory damages from all parties found liable to the plaintiff.

¶80 Where we disagree with Lorbiecki is in the determination of "any compensatory damages." Here, the jury award for Carol's loss of society and companionship was reduced as a function of WIS. STAT. § 895.04(4). Although

Lorbiecki argues the compensatory damages would equal the award in the jury's verdict before the application of any statutory caps, the maximum punitive damages are formulated by statute in relation to the recoverable compensatory damages.[26] *See Chang v. State Farm Mut. Auto. Ins. Co.*, 182 Wis. 2d 549, 565, 514 N.W.2d 399 (1994) ("The statutory maximum is not a measure of damages, nor a limit upon the amount of damage which may be awarded by the jury; rather it is a limit only on recovery."). Under these facts, the "award" consisted of the amount the jury found on the verdict; whereas, "recovery" is the amount of the award that a plaintiff has a legal right to enforce, after apportionment of liability and application of statutory caps.

¶81 It would evade the logic of the punitive damages statute, and ignore the plain meaning of the word "twice" in the statute, to have the maximum punitive damages exceed twice the amount of compensatory damages that a plaintiff was legally entitled to recover under a favorable judgment. *See Kalal*, 271 Wis. 2d 633, ¶47. Therefore, we conclude that the proper formulation of the maximum punitive damages to which a plaintiff is entitled under WIS. STAT.

---

[26] As our supreme court explained:

> [A] party-beneficiary may prove damages in excess of the statutory maximum, suffer a reduction in those damages for contributory negligence pursuant to sections 895.04(7) and 895.045, Stats., and still be entitled to collect up to the statutory maximum, assuming that damages equal to or greater than the statutory maximum remain after reductions have been made for his or her contributory negligence.

*Chang*, 182 Wis. 2d at 566. The same process is true here. The jury awarded $1.35 million for Carol's loss of society and companionship damages. Pabst's 42% apportionment of liability was applied first, then the statutory maximum cap was applied, and finally, combined with the other damages, Lorbiecki's compensatory damages against Pabst for the loss of society and companionship were determined.

§ 895.043 is double the total, recoverable compensatory damages after any statutory caps are applied.

¶82    We now turn to Pabst's argument that allowing the punitive damages calculation based on total compensatory damages and not the apportioned compensatory damages is an absurd result.  Pabst contends that such a system for punitive damages punishes Pabst for the wrongdoing of others.  Punitive damages have always been intended to serve as punishment and deterrence.  *See Fahrenberg*, 96 Wis. 2d at 234 ("Punitive damages are not awarded to compensate the plaintiff for the loss sustained.  They are allowed for purposes of public policy to punish the wrongdoer and to deter … future similar wrongdoing.").  Pabst ignores that the jury awarded $20 million in punitive damages solely against Pabst; no imputation of punitive damages occurred, so Pabst's argument that it is being punished for the conduct of others is not persuasive.

¶83    Pabst posits that interpreting the punitive damages statute to double the entire recoverable compensatory damages would lead to an absurd result in situations in which a 1% tortfeasor could be punished with 100% of the punitive damages.  In response, Lorbiecki argues that the cap on punitive damages does not negate the court's power to review a punitive damages award as excessive and violating due process.  *See **Management Comput. Servs., Inc.***, 206 Wis. 2d at 193 ("The Due Process Clause of the Fourteenth Amendment imposes substantive limits on the size of punitive damage awards.").  ***Management Computer***

*Services, Inc.* also provided factors to determine whether a punitive damages award was excessive.[27]

¶84 Nevertheless, we reject that our interpretation of WIS. STAT. § 895.043 leads to an absurd result. Although Wisconsin previously resisted applying a fixed multiplier, *Trinity Evangelical Lutheran Church & Sch.- Freistadt v. Tower Ins. Co.*, 2003 WI 46, ¶63, 261 Wis. 2d 333, 661 N.W.2d 789, the legislature created such a limit of no more than twice "any compensatory damages" in 2011. 2011 WIS. ACT 2 § 23M. Section 895.043(6) acts to avoid those constitutional concerns by capping punitive damages, and a two-time maximum multiplier likely provides due process against excessive damages. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) ("Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution[.]").

¶85 Under our interpretation, Pabst is correct that WIS. STAT. § 895.043 might not always prevent an unconstitutionally excessive punitive damage award with regard to a particular defendant. But this is not an absurd result. When a party alleges that a statute is unconstitutional on its face, "the challenger must

---

[27] The Supreme Court of Wisconsin set forth the following factors for a circuit court to consider as relevant to the facts of the case:

> [T]he grievousness of the acts, the degree of malicious intent, whether the award bears a reasonable relationship to the award of compensatory damages, the potential damage that might have been caused by the acts, the ratio of the award to civil or criminal penalties that could be imposed for comparable misconduct, and the wealth of the wrongdoer.

*Management Comput. Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 194, 557 N.W.2d 67 (1996).

show that the law cannot be enforced 'under any circumstances.'" ***Mayo v. Wisconsin Injured Patients & Fams. Comp. Fund***, 2018 WI 78, ¶24, 383 Wis. 2d 1, 914 N.W.2d 678 (citation omitted).  This court's interpretation of § 895.043 does not create a constitutional issue so much as it fails to prevent every possible constitutional issue related to excessive punitive damages.  We note that § 895.043(6) can only reduce a punitive damages award, it cannot increase the difference between compensatory damages and punitive damages.  Thus, Pabst's challenge fails because it cannot show that this interpretation of the punitive damages statute would violate due process in every circumstance.

¶86     Further, Pabst has not challenged the actual punitive damages award as excessive and in violation of due process.  In other words, Pabst has not raised an as-applied challenge to the statute.  An as-applied challenge considers whether the statute is constitutional for this party, under the particular facts in the case, while the statute itself is presumed constitutional.  ***Mayo***, 383 Wis. 2d 1, ¶56.  However, we will not consider arguments Pabst has not raised.  ***State v. Pettit***, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (concluding that we may decline to consider undeveloped arguments).

## CONCLUSION

¶87     We conclude that Pabst's arguments fail.  The evidence was sufficient to sustain the verdict.  The circuit court's evidentiary and jury instructions decisions were within its discretion.  There was clear and convincing evidence for the jury to consider punitive damages.  The circuit court did not err when it imputed Sprinkmann's liability to Pabst.  The circuit court did not err when it denied Pabst's motion for JNOV.  We conclude that Lorbiecki's cross-appeal succeeds in part and we reverse the order of judgment in part.  The circuit

court erroneously calculated the punitive damages under WIS. STAT. § 895.043(6). We instruct the circuit court to enter punitive damages in the amount of $11,090,327.10, which equals twice the total compensatory damages previously determined by the circuit court to be $5,545,163.55. The order of judgment of Pabst's liability for compensatory damages, $2,328,968.69, based on 42% liability, remains as ordered previously. We instruct the circuit court to enter judgment against Pabst for the new total, which equals $13,419,295.79. We decline to order costs to either party.

*By the Court.*—Judgment affirmed in part; judgment reversed in part and remanded with directions.

Recommended for publication in the official reports.